UNITED STATES, Appellee

v

THOMAS J. SINIGAR, Private E–2, U. S. Army, Appellant

6 USCMA 330, 20 CMR 46

No. 6356

Decided September 16, 1955

*Captain Albert C. Malone, Jr.*, argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Jackson K. Judy* and *Lieutenant Colonel Edward Duvall.*

*First Lieutenant Peter J. Hughes* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant Howard S. Marcu.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This case presents a novel issue. The accused was found guilty by a general court-martial of absence without leave, failure to obey a noncommissioned officer, and wrongfully refusing to testify before a Coroner's Inquest at Sydney, Canada, in violation of Articles 86, 92, and 134, respectively, Uniform Code of Military Justice, 50 USC §§ 680, 686, and 728, respectively. He was sentenced to dishonorable discharge, total forfeitures, and confinement for two years. The convening authority approved, and the board of review, having reduced the term of confinement to one year, affirmed. We granted review without specifying an issue, and counsel have briefed and argued the following four points (which we have rephrased):

(1) Whether the accused had a right to refuse to testify before the Canadian Coroner's Inquest;

(2) Whether the accused may be punished by both Canada and the United States for what he insisted was essentially one act;

(3) Whether the evidence is sufficient to establish that the accused's conduct was wrongful and discreditable; and

(4) Whether the law officer erred in his instructions on the maximum punishment for the offense of wrongful refusal to testify.

Only the first three questions will be discussed, for the fourth is rendered moot by our disposition of the case. No question is raised concerning the validity of the convictions for absence

332

without leave and failure to obey. Our sole inquiry concerns the conduct of the accused before a Coroner's Inquest.

On July 2, 1954, Mr. A. D. Muggah, Acting Coroner for the County of Cape Breton, conducted an inquisition concerning the death of a Mrs. Florence B. Taverne. During the course of this proceeding, the accused was called and sworn as a witness. After answering several questions of a general nature, the following exchange took place:

"Q. And eventually did you meet a man by the name of Ivey Best?
A. That's right.

"Q. And did you go somewhere with Ivey Best?
A. What are you interest [sic] in this girl or Ivey Best?

"Q. Are you going to answer questions?
A. No, I don't intend to answer that.

"Q. Do you intend to answer questions?
A. No.

"Alright, Mr. Coroner, I an [sic] asking you to commit this witness for contempt.

By Mr. Muggah
"Q. The reason why you refuse to answer these questions?
A. I don't see the point of this.

"You must realize that Mr. Finlayson is not asking these questions out of idle curiosity.

By Mr. Finlayson
"Q. Are you going to answer questions?
A. No, I don't intend to unless you want to know about this girl.

By Mr. Muggah
"Well now Mr. Sinigar if you persist in this attitude I will have no course but to have you imprisoned for contempt?

By Sinigar
"A. Do just that."

The accused was thereafter committed to a Canadian jail for a period of 11 days, after which he appeared before the inquest, testified fully, and purged his contempt.

Counsel for both parties have grappled at length, in both briefs and argument, with the question of whether the accused had a legal right to refuse to testify. We do not answer that question here, for our decision turns on the privilege of the accused to test his legal right to refuse to answer without bringing discredit on the military service. However, to establish that the refusal to testify was in the realm of reason, we think it advisable to set forth our views.

Because contempt proceedings are in a class by themselves, and because we have been unable to find a case on all fours with the one at hand, we must analogize our present problem to those faced by other courts in different settings. We take it as established by judicial decision that Federal courts normally lack authority to inquire as to the merits of a foreign in personam judgment entered in a civil action against an American citizen. In Hilton v Guyot, 159 US 113, 16 S Ct 139, 40 L ed 95 (1895), it was held that an in personam judgment rendered against a United States citizen in a foreign country will be given conclusive effect in American courts unless the foreign country does not give conclusive effect to judgments of the courts of the United States. Where the nation rendering judgment does not treat American judgments as conclusive, the judgments of that nation are given at least prima facie effect. Mr. Justice Gray, the organ of the court, spoke as follows (page 202):

"In view of all the authorities upon the subject, and of the trend of judicial opinion in this country and in England following the lead of Kent and Story, we are satisfied that where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of

justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court or in the system of laws under which it was sitting, or fraud in procuring the judgment or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact. The defendants therefore cannot be permitted upon the general ground to contest the validity or the effect of the judgment sued on."

and then he noted this exception (page 227):

"The reasonable, if not the necessary, conclusion appears to us to be that judgments rendered in France, or in any other foreign country by the laws of which our own judgments are reviewable upon the merits, are not entitled to full credit and conclusive effect when sued upon in this country, but are prima facie evidence only of the justice of the plaintiff's claim."

The general principle that foreign civil in personam judgments are entitled to conclusive effect is subject to attack on the other grounds mentioned, as well as on the theory of lack of reciprocity. Thus, it may be shown that the foreign court had no jurisdiction, Boivin v Talcott, 102 F Supp 979 (ND Ohio) (1951); Nussbaum, Jurisdiction and Foreign Judgments, 41 Col L R 221 (1941); that there was fraud on the foreign court, Goodrich, Conflict of Laws, 3d ed, page 614; that the foreign judgment was corruptly obtained, Restatement, Conflict of Laws, § 429; that the judgment was based on a cause of action contrary to our public policy, De Brimont v Penniman, 7 Fed Cas 309, No. 3,715 (SD NY 1873); that there was no fair hearing in the original determination, Banco Minero v Ross, 106 Tex 522, 172 SW 711 (1915); and, probably, that the foreign judgment was acquired without according to the de-

**334**

fendant what we know as due process of law, Griffin v Griffin, 327 US 220, 229, 66 S Ct 556, 90 L ed 635 (1946); cf. Madsen v Kinsella, 93 F Supp 319, 323 (SD W Va) (1950), aff'd 188 F2d 272 (CA 4th Cir), aff'd 343 US 341, 72 S Ct 699, 96 L ed 988.

The law of Canada, just as the law of any other foreign country not *occupied* by our troops, must be proved like any other fact. Manual for Courts-Martial, United States, 1951, paragraph 147*b*, page 275. We could not, with propriety, ascertain independently the extent to which Canadian courts give conclusive effect to American judgments. The defendant made no attempt to prove a lack of reciprocity, and so we are required to discard that exception as a possible ground authorizing inquiry into the legality of this contempt citation.

The other exceptions to the rule would be no more available to the accused here. The competency of the inquest and all of the requisites of jurisdiction were proved at this trial. Had they not been established, we would be inclined to presume their existence. Cowans v Ticonderoga Pulp and Paper Co., 219 App Div 120, 219 NYS 284 (1927), aff'd 246 NY 603, 159 NE 669 (1927). A Canadian coroner is entitled to summon a jury to inquire into the circumstances of death, to subpoena witnesses, and to compel testimony. Furthermore, the power to punish for contempt is not beyond the reach of a Canadian coroner. Snow, Criminal Code of Canada, 5th ed, § 678 (an exhibit at trial). No attempt was made to prove either fraud or corruption in the Canadian proceeding, and the verbatim record made of the accused's performance as a witness reveals that he was given a fair opportunity to be heard. Nor were the essentials of due process lacking. Had he requested representation, he would have received it, and had he asserted a privilege against self-incrimination, Section 5 of the Canada Evidence Act, RSC, 1927, chapter 59, would have been available to him. Furthermore, the commitment for contempt of a recalcitrant witness is by no means repugnant to our public policy. Article 47, Uni-

form Code of Military Justice, 50 USC § 622. Thus, it follows that if, by way of analogy, we were to apply the rule of Hilton v Guyot, supra, to a criminal case, we would be forced to accept as proper the citation and incarceration of the accused for contempt.

We believe, however, that civil cases involving the attempted use of prior criminal convictions deal ▮▮▮▮▮ with principles more clearly akin to those at issue in this litigation. As a general rule, a prior criminal conviction, and especially a foreign one, is not accorded conclusive effect in a later civil action, Rostron v Rostron, 49 RI 292, 142 Atl 162, 163 (1928); Wigmore, Evidence, 3d ed, § 1346. This rule is illustrated by the case of Schindler v Royal Ins. Co., 258 NY 310, 179 NE 711 (1932). There, the plaintiff sued on an insurance policy for a fire loss. Defendant defended on the ground that plaintiff had been convicted in a New York court of presenting a false and fraudulent proof of loss in connection with this fire, and asserted that such a conviction was a complete bar to the maintenance of this action by the plaintiff. The court first observed:

"Appellant does not question the existence of a general rule that conviction in a criminal action is not conclusive proof in a civil action of the facts on which the judgment of conviction rests, but challenges the application of the rule in its extreme form to this case as absurd, unjust, and unsound in principle."

and thereafter held:

"The rule in New York from an early day (Maybee v Avery, 18 Johns 352) has relaxed the strict rule of complete exclusion. It permits proof of the conviction as prima facie evidence of the facts involved.

. . . . . . .

"It would be an unedifying spectacle if the courts should now apply the strict rule which excluded all reference to the judgment of conviction in the civil action as evidence tending to establish the material facts. We shall, however, continue to hold that it is not effective as a plea in bar."

In New York & Cuba Mail S. S. Co. v Continental Ins. Co., 117 F2d 404 (CA 2d Cir) (1941), a libel was brought by the charterer of the Steamship Morro Castle to recover, under a protection and indemnity insurance policy issued by the defendant on the vessel, for the losses which it had been forced to pay as a result of a disaster at sea. Respondent defended on the ground that the loss of the Morro Castle at sea was due to the faults and neglects of the ship's master and crew, (a risk not covered) to which the charterer was privy. Defendant offered, as evidence of fault, the conviction of the ship's master for criminal default of duty in connection with the loss of the ship. This conviction was admitted in evidence by the district court below as prima facie evidence only. Although it was unnecessary to the decision, Judge Clark stated the issue as follows:

"The court was not in accord as to the force or effect to be given herein to the judgment against libellant and Cabaud in the criminal prosecution, and accordingly decision was reached without determination of that matter. In view of its interest and general importance, I deem it appropriate to state the problem, as well as my own conclusions with respect to it.

. . . . . .

"The cases are now in substantial conflict as to the effect to be given to a conviction of crime in a civil action involving the same circumstance. The older cases generally excluded such evidence; now, however, there is an apparently increasing number of cases holding to the contrary. A like trend is shown in the comments of text writers. My conclusion was that the conviction should have been treated as direct proof of the company's fault. The nature of the verdict required proof of a higher degree there than was needed here, and the full examination there had (the government presented 86 witnesses and the accused 23) made the result perhaps more trust-

**335**

worthy than here, where, as pointed out above, libellant called few witnesses and none of the ship's higher officers. I appreciate the difficulty pointed out by my associates that, since the jury might have found proven only one of the several violations charged, it is not possible to know upon which ground it went. Nevertheless all those charged were relevant to the issue herein, and I do not believe exact knowledge of the jury's reasoning is important. The verdict was a finding that libellant was guilty of a neglect resulting in loss of life at sea, and that this was knowingly and willfully caused or allowed by its executive officer charged with the control of the .operation of the vessel. I think it should be so accepted here."

Judge Augustus N. Hand held a different view, which he expressed as follows and in which he was joined by Judge Swan:

"Whatever may be the justification under some circumstances for giving any weight in a civil action to a judgment rendered against the defendant in a criminal case, such a judgment ought, in my opinion, to have no effect when the issues determined thereby are not necessarily the same as those involved in the action on trial.

"The indictment in the criminal case charged the libellant and its managing officer, Cabaud, with the infraction of statutes of the United States resulting in loss of life and both were found guilty. It is, however, impossible to determine whether either was found guilty of the particular faults which are relied on in Judge Clark's opinion as a basis for holding that the libellant has not established absence of 'actual fault or privity'. The jury may have convicted for violation of one statutory requirement where we have found a violation of another. Yet a violation of the statutory provision for fire drills would not tend to show a violation of the requirement for the division of the crew into equal watches. To give a criminal judgment eviden-

336

tial weight under such circumstances would be going much farther than admitting proof of other like acts of negligence in support of a cause of action founded on particular acts of negligence of the defendant. It more nearly resembles admitting proof that the defendant was generally careless as to unrelated matters."

Whatever else the Morro Castle case, supra, may stand for, it was at least the expressed view of all the judges that such a prior criminal conviction was not entitled to conclusive effect in a later civil action involving the same circumstances. If that is the rule when the second trial involves civil liability, it certainly ought to be the rule when the subsequent case is a criminal prosecution. Thus, if we were to adopt that view, we would be free to determine whether the accused had a legal right, under Canadian law, to refuse to testify before the inquest, regardless of the finding by the Canadian court.

### III

The next issue presents a question of double jeopardy. That is, may the accused be punished by both Canada and the United States for what he insists was essentially one act? "In that connection," the Supreme Court has said, in Jerome v United States, 318 US 101, 105, 63 S Ct 483, 87 L ed 640 (1942), "it should be noted that the double jeopardy provision of the Fifth Amendment does not stand as a bar to Federal prosecution though a state conviction based on the same acts has already been obtained." We have here two sovereignties, deriving power from different sources, and capable of dealing with the same subject matter within the same territory. United States v Lanza, 260 US 377, 43 S Ct 141, 67 L ed 314 (1922). Assuming for the moment that there was but one act done by the accused, international law has long recognized the possibility of the existence of two concurrent jurisdictions. 1 Oppenheim, International Law, 7th (Lauterpacht's) ed, § 145. In this case, jurisdiction in the United States springs from its personal supremacy over the individual, while Canadian jurisdiction is founded

upon its sovereignty in the place where the offense occurred.

Although it is the general rule, in the absence of an international agreement, that whenever armed ■■■■■■ forces are on foreign territory in the service of their home state they are considered exterritorial and remain under its jurisdiction, that proposition has no application here. Where, as in this case, a soldier belonging to a foreign garrison leaves his camp, post, or station, not on duty but for recreation and pleasure, and commits an offense, the local authorities are competent to punish him. United States v Thierichens, 243 Fed 419, 420 (ED Pa) 1917; 1 Oppenheim, International Law, supra, § 445; King, Further Developments Concerning Jurisdiction over Friendly Foreign Forces, 40 Am J Int'l L 257 (1946).

In order to escape the general rule, it is vigorously urged by defense counsel that the North Atlantic ■■■■■■ Treaty Organization, Status of Forces Agreement, 99 Cong Rec 8838, July 15, 1953, has effectively re-established the theory of double jeopardy as a complete barrier to trial in circumstances such as exist here. Paragraph 8, Article VII, of this Agreement provides as follows:

> "Where an accused has been tried in accordance with the provisions of this Article by the authorities of one Contracting Party and has been acquitted, or has been convicted and is serving, or has served, his sentence or has been pardoned, he may not be tried again for the same offence within the same territory by the authorities of another Contracting Party. However, nothing in this paragraph shall prevent the military authorities of the sending State from trying a member of its force for any violation of rules of discipline arising from an act or omission which constituted an offence for which he was tried by the authorities of another Contracting Party."

We are met at the outset with the question of whether the accused was "tried" by the Canadian court within the meaning of the word as used in the quoted paragraph. The answer to this question depends upon whether a contempt commitment is viewed as a trial under Canadian law. But we are faced with a failure of proof at the trial level, for nothing was shown concerning local law on the subject. We are remitted, therefore, to an examination of American law on the subject, for reasons which will later appear.

In Ex Parte Terry, 128 US 289, 309, 9 S Ct 77, 32 L ed 405 (1888), the Supreme Court had this to say concerning contempts committed in the very presence of a court:

> "It results from what has been said that it was competent for the circuit court, immediately upon the commission, in its presence, of the contempt recited in the order of September 3, to proceed upon its own knowledge of the facts, and punish the offender, without further proof, and without issue or trial in any form. It was not bound to hear any explanation of his motives, if it was satisfied, and we must conclusively presume, from the record before us, that it was satisfied—from what occurred under its own eye and within its hearing—that the ends of justice demanded immediate action, and that no explanation could mitigate his offense or disprove the fact that he had committed such contempt of its authority and dignity as deserved instant punishment."

This opinion has been often cited and followed, and its rationale is now embodied in Rule 42(a), Federal Rules of Criminal Procedure, 18 USC. Offutt v United States, 348 US 11, 75 S Ct 11, 99 L ed 7 (1954); United States v Landes, 97 F2d 378, 380 (CA2d Cir) (1938).

There is sound cause to accord special status to contempt proceedings, and refuse to characterize them as trials. The power to punish for contempt is inherent in every Federal court. It is summary in nature, and is the primary instrument through which a court safeguards its own authority. Thus, in their very essence, contempt proceedings are *sui generis*. Ex Parte Grossman, 267 US 87, 45 S Ct 332, 69 L ed

527 (1925). They possess none of the touchstones of a trial, as we know them. In the case of a direct criminal contempt, there need not be indictment, nor jury, nor the reception of evidence, nor opportunity extended to the defendant to be heard, nor the entry of a formal judgment. Sacher v United States, 343 US 1, 72 S Ct 451, 96 L ed 717 (1952); Ex Parte Terry, supra.

In the case of In re Manufacturers Trading Corp., 194 F2d 948, 956 (CA 6th Cir) (1952), a bankruptcy proceeding, the appellant, a partner in the bankrupt concern, was called as a witness before the master appointed by the court. Upon his refusal to give testimony, he was held in contempt by the district court and committed to the custody of the marshal until he should submit to examination. Relying, among others, on the authorities which we have earlier set forth, the court held that, although contempt proceedings are criminal in nature, and contempt orders are appealable, such proceedings are not criminal prosecutions. Thus, the normal constitutional safeguards are not available to a defendant, and he is not entitled to a trial.

We take it as established, therefore, that a criminal contempt proceeding is not treated as a trial within the Federal system. Furthermore, we may presume that the Canadian rule is the same as that of the United States. Our reasoning is aptly illustrated by the following quotation from Wigmore, Evidence, 3d ed, § 2536:

"*Similarity of Foreign Law.* Whether a foreign rule of law is to be adopted as applicable to any part of the litigation before the Court, depends upon principles of substantive law. Supposing the foreign rule to control, then it is to be noted, with reference to ascertaining the terms of the foreign rule, that if the Court does not know it judicially (*post,* § 2573), it must be proved like any 'factum probandum' (*post,* § 2258), and that in aid of such proof a presumption may within certain limits be resorted to, as follows:

"If it is the law of a State possessing the English *common law as the foundation of its system,* in particular, *one of the United States,* it is generally said to be presumed to be the same as that of the forum. Even if it involves the existence of a statutory enactment altering the common law, the same rule is often applied (*i.e.* by presuming that the statutory alteration in the forum has been repeated in the other State by a similar process of evolution), though many Courts draw a distinction here and confine the presumption to the common or judicially-declared law. But if the *foreign State* is *not* one whose system is founded on the common law, the presumption will probably not be made, unless the principle involved is one of the law merchant common to civilized countries."

Because Canada is a common law country, it follows that the accused was not "tried" for his refusal to testify by the Canadian court, within the meaning of the Status of Forces Agreement.

IV

We come then to the question of the sufficiency of the evidence. May it fairly be said there is substantial evidence to justify the conclusion that the accused's conduct was wrongful and discreditable to the military service? We conclude not.

The facts out of which the third specification arose were not in substantial dispute at trial. It was the theory of the Government that members of the Armed Forces, to preserve the good name thereof, have a positive duty to cooperate with the law enforcement officials of a friendly nation, in the exercise of their functions, and that failure to do so is a violation of the general article, in that it tends to discredit the military services. We need not quarrel with that general proposition, which accords with prior military law; United States v Coleman, 6 BR—JC 35, but it cannot be extended to cover the situation where an accused merely seeks to test a substantial right which he be-

338

lieves, on reasonable grounds, that he is entitled to exercise.

Mr. Finlayson, the crown prosecutor of Sydney, Nova Scotia, was in charge of the examination of the accused at the inquest, and testified at this trial as an expert witness concerning Canadian law. He conceded that a witness has the right to raise an objection to the relevancy of a question. Mr. Muggah, the coroner, had earlier testified that the statements made by the accused could be taken as an objection on the basis of relevancy; that the questions he refused to answer were not relevant on their face, although Ivey Best was later shown to be a relevant witness at the inquest; and that although Mr. Muggah regarded the questions asked of the accused as relevant, he did not require a showing of relevancy before committing the accused for contempt.

Although we have concluded not to decide firmly that we can go behind the coroner's determination that the accused had no legal right to refuse to testify, it would seem that under Canadian law, relevancy should be shown prior to a contempt commitment. In the case of Re Ayotte, 1 WLR 79, 15 Man R 156, 9 CCC 133, 11 Can Abr 534 (1905), it was said:

> "To justify a magistrate [or coroner] committing a witness under this section, it must appear not only that the witness refused without just excuse to answer, but that the question asked was in some way relevant to the issue."

We do, however, consider it appropriate to examine all of the facts of the coroner's inquest to determine whether the accused was in an area of sufficient doubt to permit him to test the relevancy of the question. When we do that, the admitted facts show no more than that the relevancy of the questions was not self-evident and the accused voiced an objection he was entitled to raise. Had he been familiar with pertinent Canadian case law, it would only have supported him in his objection. Re Ayotte, supra. We cannot believe that because his objection resulted in his commitment, that he is guilty of base and unsoldierly conduct. To do so would require every accused to test his rights in foreign countries at the risk of being discharged from the service by way of court-martial. Certainly there is civilian precedent for the view that a commitment for contempt does not necessarily include a finding of bad faith on the part of the witness who refused to testify. In Rubin v State, 194 Wis 207, 216 NW 513, 517 (1927), it was said:

> "One situated as was Mr. Rubin might well raise the question of jurisdiction [of the court to compel him to testify] and desire to have that question finally determined by a court of last resort. Those who act in good faith in such matters ought not to be penalized, if, after the question is finally determined, they show a willingness to purge themselves of the contempt by submitting to the taking of the oath and the giving of testimony as directed by the court at the time the contempt was committed. Those who raise this question of jurisdiction in good faith, and not for any ulterior purpose, will readily accept this privilege of purging themselves of their contempt."

If then, the accused acted upon reasonable grounds in asserting a legal right, on what basis may it be said that his refusal to testify was wrongful or discreditable? Certainly not because he put the Canadian Government to its proof of relevancy. Government counsel point to the evidence that the accused's attitude before the inquest was contemptuous, and reason that this was wrongful and discreditable. But this thrust seems to miss the mark. The specification did not mention any grounds remotely connected with improper court manners, and the demeanor of the accused was not so out of place as to call forth a rebuke from the presiding officer. The accused was held in contempt because he refused to testify, not because he was arrogant. It is charged here that the accused's refusal to testify was discreditable, not that his attitude was disreputable. Furthermore, the characterization of the accused's attitude as contemptuous is too

**339**

slight a circumstance to support alone the conclusion pressed for by the Government, that the accused brought the military service into disrepute. The assertion of a legal privilege in this setting is too far removed from discrediting conduct, even though the privilege was found not to exist, to be an adequate basis to support a finding of guilt under Article 134.

It is next urged upon us that the accused brought discredit upon the military service by failing to ▇▇▇▇▇▇ cooperate fully with the authorities of a friendly nation, even though, technically, he may have had a legal right to raise the question of relevancy. An attempt is made to justify this argument by relying on Fletcher v United States, 26 Ct Claims 541, 563 (1891), where it was said:

"In military life there is a higher code termed honor, which holds its society to stricter accountability; and it is not desirable that the standard of the Army shall come down to the requirements of a criminal code."

We concur with those sentiments but their relevancy here escapes us. The court in that case was speaking of the offense of wrongfully refusing to pay a just debt. The observation which we have quoted was made in connection with a portion of the opinion which held that such an act could be conduct unbecoming an officer and a gentleman, even though it was not, at the time, a civilian offense. But that is not this case.

If, as a matter of sound public policy, the courts of a friendly sovereign power choose to extend certain rights to those who may chance to appear before them in a testimonial role, we can hardly believe that an exercise of those rights by an American soldier would tarnish the good name of the military service to which he belongs. We, therefore, hold that the evidence is insufficient to establish that the act of the accused in refusing to testify was such reprehensible conduct as to bring discredit on the Army.

The decision of the board of review is affirmed as to Charges I and II, and reversed as to Charge III. The record of trial is returned to The Judge Advocate General of the Army for reference to the board of review, to enable it to determine a legal and appropriate sentence for the convictions affirmed here.

Judge BROSMAN concurs.

QUINN, Chief Judge (concurring in the result):

I have a number of reservations regarding the reasoning of the principal opinion. Suffice it to note that I disagree with the majority's narrow construction of paragraph 8, Article VII, of the Status of Forces Agreement. In my opinion, the provision includes every kind of proceeding which contemplates punishment for wrongful conduct.

I concur in the result.