UNITED STATES, Appellee

v

DALLAS G. MURPHY, JR., Sergeant First Class,
U. S. Army, Appellant

7 USCMA 32, 21 CMR 158

No. 7736

Decided April 27, 1956

*First Lieutenant Bert M. Gross* argued the cause for Appellant, Accused. With him on the brief was *Major Edwin Doran.*

*First Lieutenant Edward S. Nelson* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant Russell L. Brenneman, Jr.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Following his trial by general court-martial, the accused was convicted of wrongfully disposing of Government property worth more than $50.00, in violation of Article 108, Uniform Code of Military Justice, 50 USC § 702. He was sentenced to dishonorable discharge, total forfeitures, and confinement for three years. Intermediate reviewing authorities have affirmed, and we granted review to determine whether the law officer's ruling, that a prosecution witness could not refuse to answer incriminating questions, was erroneous and prejudicial to the accused. Only those facts which are necessary to an understanding of the issue involved will be related.

The prosecution proceeded on the theory that the accused and three other American soldiers, together with one Kin Hangi, a Korean national resident in Japan, had entered into a conspiracy to remove Government clothing from a Regimental supply warehouse and sell it on the Japanese black market. In effectuating the plan, the accused procured the forms necessary to permit removal of Government clothing from the warehouse, the other soldiers provided transportation and performed the physical work involved, and Hangi disposed of the merchandise.

When the soldier conspirators were called as witnesses, they refused to testify on the ground that their answers would tend to incriminate them, and, in each instance, the assertion of the

privilege was upheld by the law officer. However, when Kin Hangi was called as a witness and asserted a similar privilege, on the ground that a prosecution was pending against him in a Japanese court, the law officer overruled his objections and directed him to testify. The law officer based his ruling on the principle that Hangi was a Korean national resident and employed in Japan; that he was not subject to the territorial jurisdiction of any American court; that he was not subject to prosecution by the United States; and, therefore, he could not claim the privilege against self-incrimination set forth in Article 31 of the Code, 50 USC § 602. It is the correctness of this ruling which is before us.

## II

Article 31 (*a*) of the Uniform Code of Military Justice, which spells out the privilege against self-incrimination for trials by courts-martial, provides as follows:

"No person subject to this code shall compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him."

This enactment has been amplified by the Manual for Courts-Martial, United States, 1951, paragraph 150*b*, where it is said:

"*Compulsory self-incrimination.*— The fifth amendment to the Constitu-

**33**

tion of the United States provides that in a criminal case no person shall be compelled 'to be a witness against himself.' The principle embodied in this provision applies to trials by courts-martial. It is not limited to the person on trial but extends to any person who may be called as a witness. Also, Article 31a provides that no person subject to the code shall compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him.

"If the witness states that the answer to a question might tend to incriminate him, he will not be required to answer the question unless it clearly appears to the court that no answer he might make to the question could have that effect or unless the witness has waived the privilege against self-incrimination."

On the basis of these provisions, the accused contends that the law officer erred in compelling Hangi to testify, arguing that the witness falls within the ambit of the term "any person," the sweeping language used in the statute. It may be that the witness can bring himself within that term, but, for other reasons which will be developed fully, the law officer ruled properly.

It is familiar learning in every American jurisdiction that a witness may refuse to answer questions which tend to incriminate him in the jurisdiction where the privilege is asserted, but the question of whether this privilege extends to protect the witness who may incriminate himself in a foreign jurisdiction has never earlier been before us for resolution. It is our purpose to settle the principle in military law, and, because Professor Wigmore has adequately summarized the arguments which appeal to us, we will quote from his learned treatise on evidence.

In Wigmore, Evidence, 3d ed, § 2258, after vividly portraying the difficulties to be encountered if the laws of every jurisdiction must be searched, the author develops the rationale forbidding extension of the privilege, saying:

"But, more than this, the answer is that a radical fallacy of principle underlies the assumption that the Courts of one State may consider the effect of enforced disclosures as creating a danger of prosecution in another sovereignty. It is not in the power or duty of one State, or of its Courts, to be concerned in the criminal law of another State. For the former, there is but one law, and that is its own. The boundaries of our Constitution and our sovereignty are coextensive. A constitution is intended to protect the accused against the methods of its own jurisdiction and no other. The Court's view, as well as its functions, should be confined to its own organic sphere.

"Practical considerations also deter. The Court of one State knows nothing of the policies and rules of other systems; and it risks error and adds great burdens in attempting to master them. Further, it cannot well know the real probabilities of danger of prosecution under another system; for it would need to know what means and motives for prosecution there existed, what likelihood there was of migration thither by the accused or of his capture when arrived or of his involuntary extradition, and what the probability was of the discovery and employment in that prosecution of the disclosure now desired. Even if it could ascertain these elements of probability, it could not define any workable rule for measuring them. The only conceivable rule would be that when an act was by any possibility capable of being treated as criminal by the law of any other sovereignty, the privilege should protect it. That such a rule should be seriously suggested seems incredible."

When we turn, for the moment, to the cases which are cited in support of the rule that the privilege should not be extended to cover conduct made criminal by foreign law, it is easily seen that some are of no aid to us here, for one reason or another, and we can dispose of them in short order.

In Williams v Commonwealth, 128 Va 698, 104 SE 853 (1920), and State v Williams, 98 NC 599, 4 SE 518 (1887),

the decisions contain language asserting that the privilege should not be extended, but are really decided on the ground that the questions asked would not tend to incriminate, and thus no question of a witness' privilege to refuse to answer was presented.

In the cases of In re Werner, 167 App Div 384, 152 NY Supp 862 (1915); Doyle v Hofstader, 257 NY 244, 177 NE 489 (1931); State v Wood, 99 Vt 490, 134 Atl 697 (1926); People v Butler St. Foundry & Iron Co., 201 Ill 236, 66 NE 349 (1903); and King of Two Sicilies v Willcox, 7 St Tr NS 1049, 1 Sim NS 301, 61 Eng Rep 116 (1851), the courts refused to extend the privilege so as to protect against self-incrimination under foreign law, but did so on the premise that prosecution under foreign law was exceedingly remote. However, in the present case, the witness was in Japan, amenable to Japanese law, and testified that a prosecution against him was pending. Hence, it cannot successfully be asserted that the risk run by the witness was remote, and thus these cases are of no aid to our present inquiry.

We turn, then, to a consideration of the theories that the protection granted by Article 31 to a witness before military tribunals is limited to safeguarding him from self-incrimination under United States law and no other, and that a court-martial cannot judicially know, or properly master, the policies and laws of all foreign jurisdictions. We have concluded that these theories are eminently sound, and of sufficient merit to be adopted by us. Certainly, they have found wide favor in Federal decisions.

In Hale v Henkel, 201 US 43, 26 S Ct 370, 50 L ed 652 (1905), a witness before a Federal grand jury, who had been granted Federal immunity from prosecution as to the matters involved, nevertheless refused to answer certain questions on the ground that his answer might tend to incriminate him under state law. Having been held in contempt of court and remanded to the custody of the United States Marshal, the accused sought habeas corpus, and appealed to the Supreme Court from a circuit court dismissal of his writ. In affirming the Circuit Court's order, the Supreme Court held:

"The further suggestion that the statute offers no immunity from prosecution in the state courts was also fully considered in *Brown* v *Walker,* and held to be no answer [to a charge of contempt based on a refusal to testify] . . . the only danger to be considered is one arising within the same jurisdiction and under the same sovereignty."

The Hale v Henkel decision represented an extension of the teaching of Brown v Walker, 161 US 591, 16 S Ct 644, 40 L ed 819 (1896), for in that case the immunity granted was sufficiently broad "to be applicable whenever and in whatever court such prosecution may be had." Thus, the immunity from prosecution granted to the defendant extended to prosecution in state courts as well as Federal, and the view implicit in Brown v Walker, supra, that Congress possesses the requisite constitutional power to enact so sweeping a grant of immunity, was reaffirmed in Ullman v United States, 350 US ——, 76 S Ct ——, 100 L ed —— (Adv. Sh. 10), decided March 26, 1956. While Hale v Henkel represented an enlargement of Brown v Walker, it was by no means a radical departure, for the converse situation had already been before the Supreme Court, and upheld.

In Jack v Kansas, 199 US 372, 26 S Ct 73, 50 L ed 234 (1905), the accused, who had been granted immunity from prosecution under state law, refused to answer, in a state court, certain questions on the ground that his answers would tend to incriminate him under Federal law, and that the state immunity did not and could not hold him safe from Federal prosecution. Having been held in contempt of court, and having exhausted his state remedies, Jack sought review of the constitutional issues. The Supreme Court affirmed, saying:

". .· . . The state statute could not, of course, prevent a prosecution of the same party under the United States statute, and it could not pre-

**35**

vent the testimony given by the party in the state proceeding from being used against the same person in a Federal court for a violation of the Federal statute, if it could be imagined that such prosecution would be instituted under such circumstances. Is this fact fatal to the proceeding? We think not. [because]

. . . . .

". . . We do not believe that in such case there is any real danger of a Federal prosecution, or that such evidence would be availed of by the government for such purpose."

Although Jack v Kansas was pitched on the notion that Federal prosecution was not likely, it would seem that Federal prosecution would have been as easy as is Japanese prosecution in our case. In any event, this decision was soon followed by Hale v Henkel, supra, which was placed on the more satisfactory conceptual ground—that the privilege against self-incrimination relates only to possible prosecutions by the sovereignty which provided it.

The case of United States v Murdock, 284 US 141, 52 S Ct 63, 76 L ed 210 (1931), also merits consideration here. The Government had appealed from the District Court's order sustaining accused's demurrer to an indictment charging him with refusal to give information requested by an authorized revenue agent. It was shown that, at the hearing before the Bureau of Internal Revenue, the accused refused to answer many questions because he feared his answers might incriminate himself under state law, although not under Federal law. The Supreme Court reversed, citing Hale v Henkel, among others, saying:

"The plea does not rest upon any claim that the inquiries were being made to discover evidence of crime against state law. Nothing of state concern was involved. The investigation was under federal law in respect of federal matters. The information sought was appropriate to enable the Bureau to ascertain whether appellee had in fact made deductible payments in each year as stated in his return, and also to determine the tax liability of the recipients. Investigations for federal purposes may not be prevented by matters depending upon state law, Const. art. 6, § 2. The English rule of evidence against compulsory self-incrimination, on which historically that contained in the Fifth Amendment rests, does not protect witnesses against disclosing offenses in violation of the laws of another country. Two Sicilies v. Willcox, 7 State Tr. N. S. 1050, 1068; Reg. v. Boyes, 1 Best & S. 311, 330, 121 Eng. Reprint, 730. This court has held that immunity against state prosecution is not essential to the validity of federal statutes declaring that a witness shall not be excused from giving evidence on the ground that it will incriminate him, and also that the lack of state power to give witnesses protection against federal prosecution does not defeat a state immunity statute. The principle established is that full and complete immunity against prosecution by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination."

We come, then, to Feldman v United States, 322 US 487, 64 S Ct 1082, 88 L ed 1408 (1944), where the accused, a bankrupt, was compelled to testify in New York State bankruptcy proceeding, under a New York statute which granted an immunity. Later, he was tried under a Federal charge for using the mails to defraud, and his testimony in the New York proceeding was introduced as evidence against him. In affirming the conviction, the Supreme Court expressly considered "whether the Fifth Amendment prohibited the admission against Feldman upon his trial in a federal court of the earlier testimony given by him in the state courts." Mr. Justice Frankfurter, speaking for the Court, placed the decision solely on the ground of dual sovereignty, saying (322 US 490–491):

"But for more than one hundred years, ever since Barron v. Baltimore, 7 Pet. (U.S.) 243, 8 L. ed. 672, one of the settled principles of our Constitution has been that these Amendments

protect only against invasion of civil liberties by the Government whose conduct they alone limit. Brown v. Walker, 161 U.S. 591, 606, 40 L. ed. 819, 824, 16 S. Ct. 644, 5 Inters. Com. Rep. 369; Jack v. Kansas, 199 U.S. 372, 380, 50 L. ed. 234, 236, 26 S. Ct. 73, 4 Ann. Cas. 689; Twining v. New Jersey, 211 U.S. 78, 53 L. ed. 97, 29 S. Ct. 14. Conversely, a State cannot by operating within its constitutional powers restrict the operations of the National Government within its sphere. The distinctive operations of the two governments within their respective spheres is basic to our federal constitutional system, howsoever complicated and difficult the practical accommodations to it may be . . .

• • • • •

"The Constitution prohibits an invasion of privacy only in proceedings over which the Government has control. There is no suggestion of complicity between Feldman's creditors and federal law-enforcing officers. The Government here is not seeking to benefit by evidence which it extorted. It had no power either to compel testimony in the state court or to forestall such disclosure as a means of avoiding possible interference with the enforcement of the federal penal code. Whether testimony in a New York court should be compelled in exchange for immunity from prosecution under the penal laws of New York is for New York to say. For what purposes the United States may deem the disclosure of testimony more important than prosecution for federal crimes is for Congress to say. It has seen fit to make the exchange very sparingly. See United States v. Monia, 317 U.S. 424, 87 L. ed. 376, 63 S. Ct. 409. Certainly it is not for New York to determine when, because it suits its local policy to employ testimonial compulsion, it will relieve from federal prosecution 'for or on account of any transaction, matter or thing concerning which' a New York court may have seen fit to require testimony. Such woud be the practical result of sustaining petitioner's claim. The immunity from prosecution, like the

privilege against testifying which it supplants, pertains to a prosecution in the same jurisdiction. Otherwise the criminal law of the United States would be at the hazard of carelessness or connivance in some petty civil litigation in any state court, quite beyond the reach even of the most alert watchfulness by law officers of the Government."

The logic and reasoning of the foregoing authorities find support in the practicalities faced by military courts. We cannot judicially note Japanese law, or any law of a foreign sovereignty, United States v Sinigar, 6 USCMA 330, 334, 20 CMR 46, and we cannot expect law officers to attain any degree of expertise in these matters. A claim that an answer might tend to incriminate is usually accepted almost on faith, for to require a witness to show that such a result would follow would be to require him to prove his guilt. Wigmore, Evidence, 3d ed, § 2271. This problem is not too complex when it is feared by the witness that he will incriminate himself under Federal law, for law officers are sufficiently versed in that subject to be able to foresee reasonably whether self-incrimination from a compelled answer is possible, but when the danger assertedly feared is of prosecution under foreign law, the law officer cannot know whether the claim has the least shadow of validity. The possibility of being overreached by such a witness is ever present, and policy-wise the privilege should be denied. We therefore conclude that the privilge against self-incrimination granted by Article 31, like that granted by the Fifth Amendment, extends only to "a reasonable fear of prosecution" under the laws of the United States. Slochower v Board of Education, 350 US ——, 76 S Ct ——, 100 L ed ——, April 9, 1956.

III

Even if we were to assume that this witness could claim the privilege asserted, and that the law officer erred when he compelled him to answer, there is yet another reason why this accused cannot prevail.

**37**

The privilege against self-incrimination "is that of the person under examination as [a] witness, and, like all other privileges, is intended for his protection only . . .; consequently, it does not involve a right of the *party calling him.*" Wigmore, Evidence, supra, § 2270. Nor does it create any greater right in the party against whom the witness is called. Hudson v United States, 197 F2d 845 (CA5th Cir) (1952). In every instance where the privilege is operative, a witness has the personal choice of either answering the question put to him or exercising the option which the law gives to him to refuse to respond. United States v Howard, 5 USCMA 186, 17 CMR 186. But that is a matter between the witness and the Court, as representative of the sovereignty which called it into being. The accused, as a party, does not have the right to demand that the witness be reminded of his right to remain silent, nor does he possess the right to assert the privilege for the witness. McAlister v Henkel, 201 US 90, 26 S Ct 385, 50 L ed 671 (1906); Hale v Henkel, supra. It necessarily follows that the accused may not complain if the law officer coerces a witness to testify against him, by erroneously refusing to recognize a proper claim of this privilege. Thus, even if we assume, arguendo, that the law officer erred in forcing the witness to testify, the accused cannot take advantage of that error here.

The decision of the board of review is affirmed.

QUINN, Chief Judge (concurring):

I concur in the disposition of the case on the ground that the privilege against self-incrimination is personal to the witness, and the accused cannot complain if the witness was improperly deprived of the right. Hudson v United States, 197 F2d 845 (CA5th Cir) (1952); see also United States v Higgins, 6 USCMA 308, 20 CMR 24.

I reserve judgment on the question of the unavailability of the privilege in connection with a possible prosecution by a foreign sovereign. Perhaps the general rule is as indicated in the principal opinion (cf. Ballmann v Fagin, 200 US 186, 26 S Ct 212, 50 L ed 433); but it may not apply in certain situations. The Administrative Agreement under Article III of the Security Treaty with Japan provides that the "authorities of the United States and Japan shall cooperate in making available witnesses" for criminal proceedings in their respective tribunals. Article XVII 3(e), 3 UST 3354. If this provision extends to the use of the process of one government to compel a witness, not otherwise amenable to the process of the other government, to appear and testify, I doubt that such a witness can be forced to incriminate himself.

Judge FERGUSON did not participate in the decision in this case.