UNITED STATES, Appellee

v

FLOYD A. LEACH, Sergeant, U. S. Army, Appellant

7 USCMA 388, 22 CMR 178

389

390

No. 8193

Decided November 2, 1956

First Lieutenant Gerald G. Barton argued the cause for Appellant, Accused. With him on the brief was Lieutenant Colonel James M. Scott.

First Lieutenant Peter J. Hughes argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel Thomas J. Newton and Captain M. Douglas Hodges.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

A general court-martial convened at Fort Huachuca, Arizona, convicted the accused of wrongful cohabitation, adultery, and a species of fraud, all in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to a bad-conduct discharge, total forfeitures, and confinement for one year. The convening authority reduced the term of confinement to six months, but intermediate appellate agencies have otherwise affirmed. We granted review on three issues, which will be stated at the time each is discussed, as will those facts which are necessary to a proper solution of the questions. Because there are limited areas of agreement between the concurring and author Judges, some

of the views herein expressed do not become the law of the case.

### II

Betty Marie Leach was called as a prosecution witness to establish that the accused was married during the period of time alleged. After furnishing her name and address she stated, "if . . . permitted, I would not like to testify against my husband." The accused through counsel objected to her testimony, but the law officer overruled the objections and directed Mrs. Leach to answer the questions put to her by trial counsel. She testified that she married the accused on December 19, 1951, and that the marriage was never dissolved.

The first problem presented for our consideration is whether the law officer erred in compelling Mrs. Leach to testify, over both her objection and that of her spouse, the accused. In view of the importance to military courts of a decision on that issue, I believe a full discussion will be helpful even though the last question might be dispositive of the controversy. There are five separate principles which must be considered if this question is to be covered adequately. The first involves the question of the competency of one spouse to testify for or against the other. The second is, assuming competency, whether there is a privilege which may be exercised by either the witness-spouse or the party-spouse. The third concerns the existence of a privilege to the witness-spouse when none exists as to the party-spouse. The fourth requires an answer to the question of whether an error in compelling a witness-spouse to answer inures to the benefit of the party-spouse. The fifth and last is only material to this case as it merely requires us to determine whether the accused was prejudiced, assuming that an error of which he can complain occurred.

In order to reach the heart of this particular facet of the controversy, it must be remembered that ▮▮ at common law, a wife was not a competent witness *for* her husband in any case or *against* him except in cases involving physical injuries to her. In the early cases in the Federal courts, that rule was enforced. See Brunner v United States, 168 F2d 281 (CA 6th Cir) for a collection of these authorities. However, in Funk v United States, 290 US 371, 54 S Ct 212, 78 L ed 369 (1933), the Supreme Court overturned the previous authorities and ruled directly that the old common-law disqualification was removed and either wife or husband was competent to testify for the other. It is interesting to note, in connection with the present issue of the incompetency of a wife to testify against her husband, the reason that Court gave for refusing to be bound by archaic rules of evidence was this:

"The fundamental basis upon which all rules of evidence must rest —if they are to rest upon reason— is their adaptation to the successful development of the truth. And since experience is of all teachers the most dependable, and since experience also is a continuous process, it follows that a rule of evidence at one time thought necessary to the ascertainment of truth should yield to the experience of a succeeding generation whenever that experience has clearly demonstrated the fallacy or unwisdom of the old rule.

"It may be said that the court should continue to enforce the old rule, however contrary to modern experience and thought, and however opposed, in principle, to the general current of legislation and of judicial opinion, it may have become, leaving to Congress the responsibility of changing it. Of course, Congress has that power; but if Congress fail to act, as it has failed in respect of the matter now under review, and the court be called upon to decide the question, is it not the duty of the court, if it possess the power, to decide it in accordance with present day standards of wisdom and justice rather than in accordance with some outworn and antiquated rule of the past? That this court has the power to do so is necessarily implicit in the opinions delivered in deciding the Benson and Rosen Cases. And that implication, we think, rests upon substantial ground. The rule of the common law which denies the competency of one spouse to testify in behalf of the other in a criminal prosecution has not been modified by congressional legislation; nor has Congress directed the federal courts to follow state law upon that subject, as it has in respect of some other subjects. That this court and the other federal courts, in this situation and by right of their own powers, may decline to enforce the ancient rule of the common law under conditions as they now exist we think is not fairly open to doubt."

From that time on, the Federal courts have consistently held that one spouse is competent to testify for the other,

but the competency of one to testify against the other is left undeveloped by State and Federal cases, although I believe the better-reasoned authorities and the more enlightened statutes do not preserve the common-law rule of incompetency but rather base the reasons for excluding adverse testimony on a privilege. Be that as it may, the later Federal cases seem to have followed the spirit of a Congressional statute enacted in 1887 which made husbands and wives competent to testify against one another when the offense alleged was polygamy, but provided that they could not be compelled to do so. 24 Statutes at Large 635, 49th Congress, provided:

> "*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* SEC. 1. That in any proceeding or examination before a grand jury, a judge, justice, or a United States commissioner, or a court, in any prosecution for bigamy, polygamy, or unlawful cohabitation, under any statute of the United States, the lawful husband or wife of the person accused shall be a competent witness, and may be called, but shall not be compelled to testify in such proceeding, examination, or prosecution without the consent of the husband or wife, as the case may be; and such witness shall not be permitted to testify as to any statement or communication made by either husband or wife to each other, during the existence of the marriage relation, deemed confidential at common law."

The quoted statute and the Funk case started a trend away from the common-law rule and began a course of decisions which tended to permit a wife to testify against her husband in cases involving sex offenses against the norms of the marital state. At the present time, in addition to the rule of Federal criminal procedure hereinafter mentioned, there are other Federal and State statutes which continue this trend away from the rigidity of the common law. Illustrative of that departure are the Federal cases dealing with those sex offenses which are contrary to Federal

**394**

statutes. In Yoder v United States, 80 F2d 665 (CA 10th Cir), the Court of Appeals upheld a conviction which was supported by the testimony of the wife. The offense charged was a Mann Act violation, and the court concluded the modern view was to remove her incompetency as a witness and deny the party-spouse a privilege. A similar rule was announced in United States v Mitchell, 137 F2d 1006 (CA 2d Cir), and United States v Williams, 55 F Supp 375 (D Minn).

As a result of the Funk case, the trend of modern authorities, and subsequent Federal legislation, the act passed in 1887 and quoted by me is now obsolete, for the Federal Rules of Criminal Procedure occupy the fields of competency and privileges of witnesses. In Brunner v United States, supra, I find the following statement:

> "Out of the Funk case grew Rule 26 of the Federal Rules of Criminal Procedure, 18 U. S. C. A. following section 687, which provides:

> "*'Rule 26. Evidence.* In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an act of Congress or by these rules. The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.' "

Rule 26 quoted above is the rule governing the Federal courts, and if that is the law in those forums, then military law guided by the same principle should be sustainable. I believe the framers of the Manual recognized the drift away from the rigidity of the common law, and certainly if Federal courts have the authority to proclaim a rule prescribing the qualification of a witness, then Article 36 of the Uniform Code of Military Justice, 50 USC § 611, is ample authority for the President to do likewise. Congress granted him the authority to prescribe modes

of proof before courts-martial, and he has promulgated a rule of competency which is binding on this court. Paragraph 148*e* of the Manual for Courts-Martial, United States, 1951, provides:

"Husband and wife are competent witnesses in favor of each other. Although husband and wife are also competent witnesses against each other, the general rule is that both are entitled to a privilege prohibiting the use of one of them as a witness (sworn or unsworn) against the other. This privilege does not exist, however, when the husband or wife is the individual or one of the individuals injured by the offense with which the other spouse is charged, as in a prosecution for an assault upon one spouse by the other, for bigamy, polygamy, unlawful cohabitation, abandonment of wife or children or failure to support them, for using or transporting the wife for 'white slave' or other immoral purposes, or for forgery by one spouse of the signature of the other to a writing when the writing would, if genuine, apparently operate to the prejudice of such other."

So far I have limited my discussion to the subject of competency of a witness-spouse, but that is the beginning and not the end of the inquiry. I, therefore, move on to the second principle herein involved. Even though competency is established, the rule of privilege may bar the testimony of a witness-spouse. Unhappily this concept is frequently mixed in with the principles governing competency and confidential communications, and hence confusion has crept into the cases. Dean Wigmore, in his work on Evidence, 3d ed, § 2227, gives the history of the privilege not to testify against the opposite spouse. This is his explanation:

"*History of the Privilege.* The history of the privilege not to testify against one's wife or husband is involved, like that of civil parties (*ante,* § 2217), in a tantalizing obscurity. That it existed by the time of Lord Coke is plain enough; but of the precise time of its origin, as well as the process of thought by which it was reached, no certain record seems to have survived. What is a little odd is that it comes into sight about the same time as the disqualification of husband and wife to testify on one another's behalf (*ante,* § 600); for the two have no necessary connection in principle, and yet they travel together, associated in judicial phrasing, from almost the beginning of their recorded journey."

The two concepts of competency and privilege should be kept separate and apart, for if they are not, difficulties are encountered when other principles are applied. Certainly, if incompetency is imposed by law, I would not be confronted with either a waiver or with the question of who might claim the privilege for neither the witness-spouse nor the party-spouse would be required to claim the privilege as the statute would do that much for them. The Manual provisions point up the difference, for a reference back to the quoted section will establish that the first sentence establishes competency to testify for the other spouse. The next sentence goes on to say that each is also competent to testify against the other but that both of them have a privilege to prohibit adverse testimony. It is this privilege to which I now direct my remarks.

That there was a privilege at common law is not open to dispute, and it has been said that it was recognized before the incompetency of a wife became recognized. Accepting the view that the privilege exists, the question of moment is who could exercise the privilege. To answer that, I rely on two authorities who, it will be observed, spell out the rule used in the Manual.

We again quote from Wigmore, Evidence, supra, § 2241:

"*Whose is the Privilege.* If we consult the reason most commonly advanced in support of the privilege, namely, the prevention of marital dissension (*ante,* § 2228), it would seem to attribute the privilege to the marital *party only,* and not to the marital *witness.* That is, if the husband is

**395**

the defendant, and the wife is called against him as a witness, exclusion is here directed to prevent ill-feeling against her on the husband's part, for her revelation of the truth; and thus, if that ill-feeling of his were obviated, it would seem that no concern of hers was involved. But taking the other suggested reason for the privilege, namely, immunity from the repugnant situation of being condemned by one's spouse or of becoming the instrument of a spouse's condemnation (*ante,* § 2228), the privilege seems to be *equally* that of *party and* of *witness.* In other words, while the defendant-husband is entitled to be protected against condemnation through the wife's testimony, the witness-wife is also entitled to be protected against becoming the instrument of that condemnation,—the sentiment in each case being equal in degree and yet different in quality.

"The latter view seems generally to be accepted, by implication underlying the various judicial utterances; but precise rulings are naturally rare, and depend much on the wording of statutes. It is established in some Courts that at least the privilege belongs to the *party*-spouse against whom the other is offered as a witness. Rarely is the privilege denied to belong to the *witness*-spouse; and rarely also is it denied to belong to the *party*-spouse."

In the recent case of United States v Mitchell, supra, we find that doctrine approved. There the court stated:

"In the present case, defendant through his counsel objected 'to his wife testifying unless she is going to testify voluntarily.' The court asked her if she was willing to testify, and she replied, 'Yes.' The examination then proceeded. Although there is some basis at least under statutes for the view that the privilege is that of the witness, Commonwealth v. Barker, 185 Mass. 324, 70 N. E. 203; Commonwealth v. Barronian, 235 Mass. 364, 126 N.E. 833, clearly the better view is that the privilege is that of either spouse who

chooses to claim it. Wigmore, id. § 2241."

The next question of importance is whether adultery is an offense which constitutes an injury to the █ wife. The Manual provision is so worded as to first grant an all-inclusive privilege, and then it excepts certain classes of offenses from the over-all coverage. It must be acknowledged that the provision setting out the excepted crimes does not mention adultery. However, it would be the height of inconsistency to interpret the provision to mean that a husband did not have a privilege to prevent his wife from testifying against him when he had committed the less serious offense of unlawful cohabitation, but that the privilege extended to him when the offense charged was adultery. Black's Law Dictionary, 4th ed, page 71, defines adultery as: "Voluntary sexual intercourse of a married person with a person other than the offender's husband or wife." Cohabitation is defined (page 326) as: "Dwelling together. . . . Intercourse together as husband and wife." In practically every instance, if there was a legal wife to testify against a husband in a case involving unlawful cohabitation, the crime of adultery would be raised. If commission of the former crime constitutes an injury to the spouse, most assuredly commission of the latter would also. It is too much of a refinement to extend the privilege in one instance and deny it in another.

Wigmore, Evidence, supra, § 2239 (3), has this to say on the subject:

"That *adultery* by one spouse is an offense against the other is conceded in morals, and ought to be plain in law. The argument may be made, to be sure, that adultery by the husband (with an unmarried woman, at least) was not a crime at common law, and ought not to be a crime; but that is a mere evasion; whenever it is made a criminal offense, then if any crime at all can be a crime, not only against the State, but also a 'crime against the other,' adultery is certainly one of those crimes. So, too, is *incest* or *rape.* So, equally, is

*bigamy.* Nevertheless, judges have been found who dispute this; it has been argued, in skillful word-fencing, that a bigamous marriage is a crime 'against the marital relation,' but not 'against the wife.' The following passage may serve as a reply to that and all similar attempts to restrict the application of the statutory principles. . . ."

In furtherance of my views on this facet of the discussion, I mention the fact that we have previously interpreted the language of this paragraph of the Manual, and it was construed to be no more or no less than illustrative of the types of crimes involved. In United States v Strand, 6 USCMA 297, 20 CMR 13, we said:

"Plainly the enumeration is illustrative, not exclusive. It is also clear that injury to a testifying spouse is not confined to physical wrong but includes injury to personal rights. See: United States v Ryno, 130 F Supp 685 (SD Calif.) The Manual does not define the full scope of the exception, and neither need we mark out its metes and bounds."

Finally, the language of the Manual gives weight to a construction which includes offenses similar to those enumerated. At common law the privilege could not be claimed when the party-spouse committed physical violence upon the witness-spouse. The Manual provision shows a substantial departure from that restricted view, for the privilege cannot be claimed when either the husband or wife is injured by the offense with which the other is charged, and the word "injury" cannot be interpreted so strictly as to mean only personal violence. To construe the word to mean no more than that would cause it to be entirely inconsistent with the remaining portion of the paragraph, and that would be contrary to any canon of statutory construction. Certainly, the ordinary meaning of the language used and the class of offenses mentioned point unerringly to the construction that "injury" embraces mental suffering arising from violations of the marriage relationship. I, therefore, conclude that no privilege is available when the crime of adultery is the alleged offense.

Under ordinary circumstances, this would be the end of my discussion, but another argument is advanced. It asserts that, conceding there is no privilege which can be exercised by the party-spouse, a wife cannot be compelled to testify against her husband. That contention is merely another way of saying that the witness-spouse can claim a privilege. A short answer to that assertion is that if she alone has a privilege, it is personal to her, and the accused is not in a position to complain if it is violated. He is not entitled to object to the introduction of testimony unless his privilege is impaired. The wife may feel aggrieved by the law officer's ruling, but in this case she yielded and her right to complain forms no basis for granting relief to him. Any privilege which she had to remain silent would be similar to a privilege against self-incrimination, and we have already held that the accused cannot complain if the court requires a witness to give incriminatory answers. United States v Murphy, 7 USCMA 32, 21 CMR 158. The witness may rely on the privilege, but if he fails to do so, or is nevertheless forced to testify, no one else is entitled to obtain redress in his stead. However, I have determined to answer the contention without regard to accused's right to complain.

In order to uphold the argument that a wife can refuse to answer, it would be necessary to hold that the witness-spouse has a privilege not to testify against her husband, regardless of the nature of the offense. In other words, I would be required to conclude that, although a spouse is a competent witness in some instances, she is never a compellable witness. However, that would be contrary to the express terms of the Manual and hostile to the historical development of the rule in Military law. I fully appreciate that a holding of compellability, or no privilege as to the witness-spouse is certain instances, is contrary to the law in the District of Columbia, for its Code pro-

vides that a husband and wife are competent but not compellable to testify for or against each other. District of Columbia Code, 1951 ed, § 14–306. That act was passed in 1901, and it is at variance with many other statutes in that it excepts no offenses and the wife also has a privilege to refuse to testify for her husband. I, therefore, regard its provisions as having only academic interest in the present setting. If a spouse is made competent by statute or by the Manual, and if the language of the statute or the Manual states clearly that there is no privilege, then to hold that it was intended to effect only the party-spouse's privilege is neither logical nor sustainable.

I encounter little difficulty in construing the language of the Manual. The paragraph deals only with competency and privilege. It makes each spouse a competent witness for or against the other, but it goes on to provide that both are entitled to a privilege prohibiting the use of one of them as a witness against the other. The privilege therein described is single and indivisible, but it may be exercised by either the party-spouse, the witness-spouse, or both. The provision then goes on to say that in those cases where the wife is the injured party, there is no privilege. If there is no privilege, I fail to understand how either party has the right to claim one. A construction to that effect would ignore the plain meaning of the words used. There is no mention of any exception for either spouse, and a construction which would grant a privilege to the witness-spouse would be judicial legislation contrary to the well-expressed intent of the military legislators and in direct conflict with other canons of statutory construction.

A reference to the historical development of military law, which substantially parallels the civilian law, furnishes me with support for my holding. In this connection, I start with the premise that the common-law privilege has and is gradually disappearing in many jurisdictions and that it is a procedural matter which can be changed by Congress, the President, civilian Federal courts, and this Court in their respective fields. I believe my development will show clearly that assuming the common-law rule prevailed in military law and that incompetency and privilege prevented one spouse from testifying against the other, the law is no longer to that effect. The Manual for Courts-Martial, U. S. Army, 1917, paragraph 228, page 114, provided:

"*Privilege of wife and husband to testify.*—At common law the early rule was that neither husband nor wife is competent as a witness against the other, but later admitted an exception in a case of bodily injury inflicted by one of them upon the other.

"Certain departures have been made from the common-law rule by Federal statutes and decisions of the courts which, giving consideration to the reasons—i. e., the necessities of justice that demand relaxation of the rule in cases of bodily injury—have extended the field of instances to which the necessities of justice must necessarily apply.

"In any prosecution for bigamy, polygamy, or unlawful cohabitation under any statute of the United States, the lawful husband or wife of the accused shall be a competent witness, and may be called, but shall not be compelled to testify in such proceedings, and shall not be compelled to testify . . . without the consent of the husband or wife, as the case may be. (Act of Mar 3, 1887, 24 Stat., 635). A married woman is excluded as a witness from motives of public policy. (Lucas *v.* Brooks, 18 Wall., 436, 453.)

"The wife should be permitted to testify against her husband, even without his consent, whenever she is the particular individual directly injured by the crime committed by her husband and the facts are peculiarly within her knowledge and impossible or difficult of proof by any witness other than the wife. (State (Mo.) *v.* Bean, 78 S. W., 640.) It would therefore be appropriate in such cases against a husband as bodily injury of any character inflicted by him upon her, bigamy, polygamy, or unlaw-

ful cohabitation, abandonment of wife and children, or failure to support them, for the wife to be permitted to testify against her husband."

I call particular attention to the fact that the Manual made both husband an wife competent in certain instances, but neither could be compelled to testify. In addition, a further shield was thrown around them in that a showing of necessity was suggested. A somewhat similar statement may be found in paragraph 228 of the Manual for Courts-Martial, U. S. Army, 1921, but at that time the rule of necessity was eliminated.

In the Manual for Courts-Martial, U. S. Army, 1928, paragraph 120, the same general principle was expressed, and it appeared to be still treating the subject as one of competency. That is, a spouse was incompetent generally, but in the excepted cases, he or she was competent and could testify over the objection of the party-spouse. However, the testimony could not be compelled. If I understand the concept underlying that theory, it is no more than this: A spouse is competent in limited areas, but there is a privilege which is exercisable by the witness. If I consider the wife competent as a witness, she may or may not testify according to her desires.

Sometime thereafter, the rules as to both competency and compellability were completely changed and the doctrine of privilege was recognized. In the Manual for Courts-Martial, U. S. Army, 1949, paragraph 134 d, we find the following:

"Husband and wife are competent witnesses in favor of each other. Although husband and wife are competent witnesses against each other, the general rule is that either spouse may assert a claim of privilege against the use of one of them as a witness against the other. This privilege does not exist, however, when the husband or wife is the individual or one of the individuals injured by an offense charged against the other, as in a prosecution for bodily injuries inflicted by one upon the other, for bigamy, polygamy, unlawful cohabi-

tation, abandonment of wife or children or failure to support them, or for using or transporting the wife for 'white slave' or other immoral purposes. When the privilege does exist, it may be waived with the consent of both spouses to the use of one of them as a witness against the other. See 137b as to the privilege relating to communications between husband and wife."

This same provision was carried over into the Manual of 1951, and it has been previously quoted in this opinion. It should go without saying that the framers of both of the Manuals had some reason for choosing the language used. They stated affirmatively that there was no privilege in the enumerated cases, and that could only mean that the witness-spouse was governed by the law applicable to all witnesses.

One straw in the wind which supports my construction is found in paragraph 148e of the Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, at page 235, which states:

"*Interest or bias.* — Generally speaking, the discussion appearing in this paragraph was taken from paragraph 134d, MCM, 1949. It will be noticed that in the 1951 text, as in the 1949 text, the general rule prohibiting the use of one spouse as a witness against the other is treated as a privilege and not as a rule of competency. See Wigmore, § 2227 et seq.; United States v. Mitchell, 137 F (2d) 1006, 1008. It will also be noticed that this privilege does not exist, and that the spouse—if he or she is otherwise competent as a witness—occupies no exceptional status and may be required to testify, if he or she is the victim of the transgression with which the other spouse is charged. See Rex v. Lapworth, (1931), 1 KB 117; 28 RCL, Witnesses, section 68."

If, as indicated by this development, military law has denied the witness-spouse the privilege not to testify, that is a policy decision which has been left to the President, and his decision is not so shocking as to be impermissible. I find nothing in the present provision which could possibly be used to meet

any test we have announced for refusal to accord full weight to the Manual requirements. One reason for that statement may be found in the old concept that when the reason for the rule fails, the rule can be disregarded. Two reasons generally given for granting a witness-spouse the privilege to refuse to testify is to protect the marital relationship from being disrupted and the natural repugnancy to making the wife the instrument through which the husband is condemned. In the fields where the Manual denies the privilege, the offender has, to all intents and purposes, largely destroyed the relationship he seeks so ardently to protect. By accused's own misbehavior, he has not only injured his wife, he has undermined the family unit which is one of the cornerstones of society. Not only does the wife have an interest in it being uninterrupted by his transgressions, each state and the country as a whole are directly concerned with its stability. It is to be remembered that I am not here concerned with confidential communications, but even the protection guaranteed to them is removed if they become public. For the most part, the crimes excepted in the Manual have become known outside of the family community. Certainly, a husband could not commit bigamy, adultery, unlawful cohabitation, or any of the other mentioned sexual offenses without a third party knowing of his extra-marital sex activities. True it is that it is the wife who has been injured, and the argument is advanced that if she is willing to forgive the Government should not be concerned. That argument overlooks the fact that the desires of a witness should not prevent the forward advance of truth. Many witnesses are compelled to testify when they would like to escape the ordeal, and certainly fathers, mothers, brothers, and others do not benefit from any privilege.

While I have presented some of the arguments to support the Manual rule, there may be good countervailing ones. I need not decide which of the two sides of the argument are the most persuasive nor which I prefer. All I need to do is establish that the Manual rule is not so unreasonable as to be nonenforceable. If it is not, I am not free to disregard it.

The last question with which I must deal is whether, assuming that the law officer erred in compelling the wife to testify and that the accused is entitled to complain, he was prejudiced by the assumed error. There is ample evidence to establish the corpus delicti here, and in my judgment, he was not, for his own admissions prior to trial establish that he was married at the time when these offenses were committed. Of course, the date of his marriage is of no importance so long as it preceded the time of adultery and cohabitation, the period November 14, 1954, to May 6, 1955. In Prosecution Exhibit No. 3, which was accused's pretrial statement, the following questions and answers may be found:

"Q. Sgt. Leach are you leagally [sic] married?
A. Yes.
Q. To whom?
A. Betty Marie Leach.
Q. Have you ever lived as man and wife with any other woman?
A. Yes.
Q. With whom?
A. Norma Jean.

. . . . .

Q. Where have you lived as man and wife with Norma Jean?
A. The Mason Hotel, Lowell, Arizona and the Jonquil Courts, Bisbee, Arizona.

. . . . .

Q. How long did you live at the Mason Hotel as man & wife with Norma Jean?
A. From January 1955 to April 1955, but I was not there during the month of March.

. . . . .

Q. Why did you move out of the Mason Hotel in April 1955?
A. I was looking for my legal wife to come out here."

If the accused was looking for his legal wife to arrive there in April 1955, his marriage contract had been entered into before that time and it had not been dissolved. Accordingly, his wife's tes-

400

timony was at best cumulative on a point which was not contested at trial, and did not, I am sure, contribute in any substantial way to the finding of guilt.

### III

Specification 1 of the Charge alleged that the accused, in violation of a specific Arizona statute, had openly and notoriously cohabited, at Bisbee, Arizona, with a woman not his wife, thereby bringing discredit upon the military service. When the time came to instruct the court-martial members on the elements of this offense, the law offcer, after mentioning the other particulars of the crime, offered the following definition to guide them in their deliberations:

> "The court is further advised that the words 'open and notorious cohabitation' mean the act or state of a man and woman not married to each other who dwell together in the same house behaving themselves as man and wife."

Defense counsel objected to this definition at the time of trial and have not retreated from their earlier view, for they still contend that a court-martial must be required to find that the illicitness of the relationship was known in the community wherein the accused lived before a verdict of guilty may be returned. This, they assert, is the significance of the term "open and notorious," not only in Arizona, but also in most other jurisdictions which have passed on the question. However, I cannot agree with this contention.

I have earlier adhered to the rule that, if an offense is otherwise fully stated in an indictment or specification, an unnecessary reference to a statute is surplusage and does not render a particular pleading invalid. United States v Long, 2 USCMA 60, 6 CMR 60. Thus, I need not seek to determine the meaning of "open and notorious" according to Arizona law, a matter which seems to be open to doubt, so long as the remainder of the pleading adequately alleges an offense against military law. If I remove the unnecessary reference to the Arizona statute from the specification, the remainder of the pleading alleges that the accused openly and notoriously cohabited with a woman not his wife in a civilian community, thereby bringing discredit upon the military service. This, I hold, is sufficient to allege the offense of wrongful cohabitation in violation of military law.

It is true enough that the kind of words usually used to import criminality, such as "wrongful" and the like may not be found within the framework of this pleading. However, the names of the parties involved were alleged and clearly raise the inference that the woman involved was neither wife, nor sister, nor mother. In addition, the word cohabitation which was alleged normally carries the legal connotation of living, abiding or residing together as man and wife. Black's Law Dictionary, 4th ed, page 326. Certainly, the allegation that the accused lived as man and wife with a woman who did not enjoy that status is a sufficient allegation of wrongfulness.

Having concluded that the specification adequately alleges an offense in violation of military law, I turn to the correctness of the law officer's instruction quoted supra. I first of all note that the definition used corresponds in its essentials to that relied upon in United States v Andrews, 9 CMR 667, 674, as a proper definition of unlawful cohabitation, which, in turn, was taken from Bouvier's Law Dictionary, Third Revision, Volume II, page 1868. The Andrews case does not anywhere suggest that the illicitness of the relationship must be public knowledge, and earlier military cases have not established any such requirement. United States v Campbell, 3 CMR (AF) 329; United States v Ritchie, 20 BR 237; United States v Dunlop, 10 BR–JC 187. However, a few civilian precedents need to be considered as well.

In People v Salmon, 148 Cal 303, 83 Pac 42, 2 LRA (NS) 1186 (1905), a California court had held that a man and woman married to other persons,

who came into a community where the facts were unknown and lived quietly as husband and wife, with nothing to excite suspicion that their intercourse is adulterous, could not be convicted of living in a state of open and notorious adultery. However, in Spencer v State, 14 Okla Crim Rep 178, 169 Pac 270 (1917), the Oklahoma Supreme Court gave what I regard as an appropriate and persuasive reply to this line of reasoning, saying:

". . . That case opens the doors for parties to hie themselves to strange communities and live openly in adultery with one another and by means of concealing their true relationship impose themselves upon the public generally and be received in decent society to the humiliation and disgrace of the law-abiding people, whereas if their true relationship was known the public could protect itself against such conduct.

"It is not the policy of the law to encourage a culpable defense to an act which is itself criminal. The adulterous relationship was criminal. The living together was open and well known to the community generally. The Salmon case is based upon the assumption that after such relationship becomes known there is no public scandal and disgrace occasioned by reason of the previous living together of the parties in open adultery. In other words, the notoriety will only attach should the parties continue that relationship. It is our opinion that when such relationship has been made to appear the public scandal and disgrace is just as great and the notoriety is just as prevalent as had it been known during the entire time. The notoriety of such a continuous living together and the thought that good people had been deceived into receiving such parties into their homes and treating them with the respect and consideration due to lawfully married people is humiliating in the extreme. The Legislature never intended to condone such conduct as that merely because the guilty parties are able for a time to conceal their true relations. To so hold, in our opinion, is a fraud upon society, and tends to destroy rather than to preserve and promote the institution of marriage."

It is true that some jurisdictions have held that the impropriety of the relationship must be community knowledge, 53 CJS, Lewdness, § 2, but others have concluded that this is not an element of the offense. Warner v State, 202 Ind 479, 175 NE 661; Musfelt v State, 64 Neb 445, 90 NW 237. The latter rule I believe to be more in keeping with prior military law and sound precedent. If the illicit relationship did in fact tend to bring discredit upon the military service, and the law officer required the court-martial to so find, then the offense has been made out. I, therefore, find no error in the law officer's instructions as to this offense.

IV

Specification 4 of the Charge alleged that the accused:

". . . did, at or near Bisbee, Arizona, on or about 16 December 1954, violate Title 43, Section 2601, Arizona Code, 1939, by being a party to a contract made with the intent to deceive and defraud the Family Finance Company, Bisbee, Arizona, when he represented Norma Jean Burns (Murvey) as Betty M. Norma Leach, in negotiating a loan in the amount of $156.33 of a value of $156.33 from that concern, and thereby bringing discredit upon the military service."

Trial defense counsel requested that the law officer instruct on nine elements required under the Arizona fraud statute. The law officer refused to do so, and instead gave the following instructions as to this offense:

"1. That, at the time and place alleged, the accused entered into a contract with the Family Finance Company of Bisbee, Arizona, as alleged;

"2. That the accused represented Norma Jean Burns (Murvey) as Betty M. Norma Leach to the Family Finance Company of Bisbee, Arizona as alleged;

"3. That such representation was

to induce the Family Finance Company of Bisbee, Arizona, to enter into a contract with the accused;

"4. That, at the time and place alleged, the accused entered into a contract with the Family Finance Company of Bisbee, Arizona, with intent to deceive or defraud the Family Finance Company of Bisbee, Arizona; and

"5. That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

"The court is further advised that the terms 'deceive or defraud' mean to cheat, to mislead, to trick, or to cause to believe as true that which is false."

Defense counsel now contend the law officer erred in failing to inform the triers of the facts that to support a conviction they must find the misrepresentation was material, that the finance company had a right to, and did, rely upon the misrepresentation, and that the company thereby suffered damage.

Once again I have elected to treat the specification's reference to Arizona law as surplusage. I am sure that when a member of the military, through misrepresentation and intending thereby to deceive, obtains something of value from a civilian company, his act tends to bring discredit upon the military service. Therefore, the presence of the technical niceties required by Arizona law need not be shown to justify a conviction under this specification.

I think it should be said here, as this court has said in the case of false official statements, that materiality of a misrepresentation is a factor only insofar as it evidences an intent to deceive. United States v Hutchins, 5 USCMA 422, 18 CMR 46. Viewed in that light, it is not an element of the offense and the law officer's instructions did cover the element on which it bears. I think defense counsel's other contentions also miss their mark, however, I have found an instructional error which I regard as fatal to this conviction. A short statement of the facts would be helpful at this point.

In December 1954, while the accused was living with Mrs. Norma Jean (Murvey) Burns, he negotiated a loan from the Family Finance Company. As a condition for the loan, the company required the signature of accused's wife to the promissory note and to a chattel mortgage on an automobile given as security for repayment of the loan. Mrs. Burns signed the note and mortgage as "Betty M. Norma Leach." The company regarded this signature as giving additional weight to the note.

It is clear that the evidence is sufficient to support a finding of an intent to deceive and defraud, but that says nothing concerning the adequacy of the instructions. The term "to defraud," at least in cases where a governmental agency is not the victim, usually means the depriving of a person of property or something of value by trick, deceit, chicanery, or overreaching. Hammerschmidt v United States, 265 US 182, 44 S Ct 511, 68 L ed 968 (1924). This is the dictionary meaning as well. Black's Law Dictionary, 4th ed, page 511. And the requirement that something of value must be obtained to justify a conviction for fraud is firmly fixed in military law. Thus the Manual for Courts-Martial, United States, 1951, page 359, in speaking of false pretenses, provides that a false representation made after property was obtained, as in the case where a bad check is deceitfully given to discharge a prior indebtedness, does not result in the commission of larceny by false pretenses. Here, the law officer did not require the court members to find that the accused obtained anything of value as a result of his misrepresentation, and his instructions were inadequate to convey a proper definition of the meaning of the word "defraud" to them. Accordingly, the conviction on this specification must be reversed.

The decision of the board of review is affirmed as to the offenses of adultery and unlawful cohabitation, and reversed

as to fraudulent misrepresentation. The record of trial is remanded to The Judge Advocate General of the Army for reference to the board of review. That body may determine an appropriate sentence for the convictions affirmed herein, or take any other action not inconsistent with this opinion.

FERGUSON, Judge (concurring in the result):

I concur in the result.

I agree that the wife's testimony did not prejudice the accused. That adultery is an offense against the wife is to me not only "conceded in morals" but "ought to be plain in law." Wigmore, 3d ed, § 2239 (3). Examples of numerous offenses against the wife are delineated in the Manual in connection with her competency as the injured party. One of the examples is unlawful cohabitation. It would be unrealistic to hold that unlawful cohabitation with another woman would be an offense against the wife, yet adultery would not. I do not believe that we need reach the question of compellability in this case. The offense was against the wife. Therefore the perpetrator of the wrong, the accused, is certainly in no position to claim prejudice, regardless of the question of compellability of the wife. It appears to be the better rule that in such instances a defendant has no standing to complain. The reasons for exemption from testimonial duty are personal to the witness, "it concerns solely the *interests of the witness* in his relation to justice and the State,—his interests not to have his testimonial duty enforced against him where paramount considerations of policy prevail over the purpose of judicial investigation." The privilege does not exist "for the benefit of the party nor for the sake of the better ascertainment of the truth of his cause." Wigmore, supra, § 2196.

Specification 1 in this case sets out conduct—without reference to the statute—which may be found by the court-martial to violate Article 134, Uniform Code of Military Justice, 50 USC § 728.

"Specification 1: In that Sergeant Floyd A. Leach, U. S. Army, 581st Signal Company (EW-1), Fort Huachuca, Arizona, did, from on or about 14 November 1954 to on or about 4 April 1955, at or near Bisbee, Arizona, violate Title 43, Section 402, Arizona Code 1939, by openly and notoriously cohabitating with Norma Jean Burns (Murvey), a woman not his wife and thereby bringing discredit upon the military service."

At no place in the Code is it stated that the violation of a state statute is per se a violation of Article 134, supra. In military law the violation of a state statute may or may not be violative of the Code depending upon whether the acts alleged in violation of the state law are the type which the court could find were "disorders and neglects to the prejudice of good order and discipline in the armed forces, or conduct of a nature to bring discredit upon the armed forces." I find no error as to the court action or board of review action on this specification.

I agree that the law officer's instruction on the fraud charged was deficient and the conviction thereon must be reversed. However, not only was the word "defraud" inadequately defined, but there was also a material variance between the pleadings in the conjunctive, i. e., that the accused intended to "deceive and defraud," and the law officer's instruction in the disjunctive that the court would be justified in convicting the accused if they found that he performed the deeds alleged with the intent to "deceive *or* defraud." This would allow the court to convict the accused if they felt he possessed the intent to deceive alone, despite the fact that the pleading required the additional proof to defraud. A conviction cannot stand which would permit a finding of guilty on a lesser quantum of proof than that alleged in the specification.

QUINN, Chief Judge (concurring in part and dissenting in part):

I agree with Judge Latimer that the

404

question of the competency of one spouse to testify for or ▮▮▮▮▮▮▮ against the other must be distinguished from the privilege not to testify against the other. Unlike him, however, I cannot accept uncritically the claim that the Manual for Courts-Martial has completely wiped out the privilege of the witness-spouse to refuse to testify against the accused-spouse.

By implication at least Judge Latimer concedes that the Manual provision attempts to formulate ▮▮▮▮▮▮▮ a rule which would express the trend away from the rigidity of the common law and yet follow the practice of the Federal courts. Manifestly, Congress intended that the court-martial practice correspond as nearly as possible with that "recognized in the trial of criminal cases in the United States district courts." Article 36, Uniform Code of Military Justice, 50 USC § 611. What then was the Federal procedural background against which the Manual was promulgated? Certainly it was not Rex v Lapworth, 1 KB 117 (1931), a British case which Professor Wigmore cites as an exception to his observation that the privilege is "rarely . . . denied to belong to the witness-spouse." Wigmore, Evidence, 3d ed, § 2241. One of the primary sources which this Court has consistently recognized is the District of Columbia Code enacted by the United States Congress. United States v Eagleson, 3 USCMA 685, 14 CMR 103; United States v Slozes, 1 USCMA 47, 1 CMR 47. See also Manual for Courts-Martial, United States, 1951, paragraph 127c, which directs that in certain instances the court-martial look to the Code of the District of Columbia for the maximum punishment that can be adjudged.

Title 14 of the Code of the District of Columbia provides that "husband and wife shall be competent but not compellable to testify for or against each other." This provision was enacted by Congress in 1901. Significantly it has never been changed in the 55 years of the drift away from the common law. Moreover, it substantially coincides with the "modern"

statutes of many of the states of the United States. See, for example, Alabama Code, 1940, Title 15, § 311; Arkansas Statutes Annotated, 1947, § 43–2020; Georgia Revised Code, 1933, § 38–1604; Dart, Louisiana Code of Criminal Law and Procedure, 1943, Article 461; Massachusetts General Laws, Chapter 233, § 20. So much for the statutes.

Turning to the cases, every Federal case on the subject that I know of, and which was decided before promulgation of the Manual, has recognized the privilege. See United States v Walker, 176 F2d 564 (CA2d Cir) (1949); United States v Mitchell, 137 F2d 1006 (CA2d Cir) (1943), affirmed 138 F2d 831, cert den 321 US 794, reh den 322 US 768; United States v Levy, 153 F2d 995 (CA3d Cir) (1946); United States v Williams, 55 F Supp 375 (D Minn) (1944). In none of these cases was the witness-spouse compelled to testify. Rather the witness-spouse was willing to testify, but the defendant-spouse attempted to exclude the testimony. The principle to be gleaned from these cases is simply this—the defendant-spouse forfeits the privilege when he commits an offense which injures the other spouse. In essence, since he himself destroys the basis for the privilege, he loses the privilege. However, disregard or loss of the privilege by one spouse does not deprive the other of the right to assert it.

Fundamentally, recognition of the privilege is one of policy. It represents an effort to balance the community's interest in keeping a husband and wife —and their children—together against its interest in punishing a transgression against the law. It is interesting to note that the privilege is older than the original common-law rule of incompetency. Wigmore, Evidence, 3d ed, § 2227. In the military establishment the spousal relationship has at best only an indirect effect upon military matters. It would seem, therefore, that there is little need to sacrifice the husband-wife relationship in order to protect the larger interests of the military. Consequently, I do not believe that the draftsmen of the Manual deliberately established a rule which goes far beyond

**405**

the rule in the Federal courts and the rule in many of the state courts. I construe paragraph 148e of the Manual as merely depriving the defendant-spouse, but not the witness-spouse, of the privilege when the offense charged injured the witness-spouse.

Apart from my construction of the Manual, I also prefer to follow the United States Supreme Court's determination rather than that of Professor Wigmore regarding the effect of adultery on the privilege. In Bassett v United States, 137 US 496, 506, 34 L ed 762, 11 S Ct 165 (1890), Mr. Justice Brewer, writing for a unanimous court, said:

". . . The clause in the Civil Code is negative, and declares that the exception of the incompetency of wife or husband as a witness against the other does not apply to a criminal action or proceeding for a crime committed by one against the other. Is polygamy such a crime against the wife? That it is no wrong upon her person is conceded; and the common-law exception to the silence upon the lips of husband and wife was only broken, as we have noticed, in cases of assault of one upon the other. That it is humiliation and outrage to her is evident. If that is the test, what limit is imposed? Is the wife not humiliated, is not her respect and love for husband outraged and betrayed, when he forgets his integrity as a man and violates any human or divine enactment? Is she less sensitive, is she less humiliated, when he commits murder, or robbery, or forgery, than when he commits ploygamy or adultery? A true wife feels keenly any wrong of her husband, and her loyalty and reverence are wounded and humiliated by such conduct. But the question presented by this statute is not how much she feels or suffers, but whether the crime is one against her. Polygamy and adultery may be crimes which involve disloyalty to the marital relation, but they are rather crimes against such relation than against the wife; and, as the Statute speaks of crimes against her, it is simply an affirmation of the old,

familiar and just common-law rule. We conclude, therefore, that under this Statute the wife was an incompetent witness as against her husband."

From either viewpoint I conclude that the law officer erred in compelling Mrs. Leach to testify. It is suggested, however, that there is other evidence in the record of trial to support the finding of the accused's marriage to her. This other evidence is of three kinds. First, Mrs. Leach was called into the courtroom to enable other witnesses to see her. On each occasion she was asked to identify herself, and she did so by giving her name. These unsworn statements were plainly hearsay and inadmissible. United States v Carter, 1 USCMA 108, 2 CMR 14. Secondly, it is maintained that the accused's paramour testified that she eventually heard that the accused was married. If this knowledge was obtained from other persons, it is plainly hearsay, and, as such, it is incompetent to prove the fact of a pre-existing legal marriage. United States v Smith, 3 USCMA 15, 16, 11 CMR 15. If the information was received from the accused, it falls within the third group. This final bit of evidence which is said to show the essential fact of a valid marriage consists of a pretrial statement by the accused in which he admitted that he was married to Betty Leach. Referring to the sufficiency of similar pretrial statements in United States v Patrick, 2 USCMA 189, 7 CMR 65, we said:

". . . We have in this case the statements of accused in Exhibits 2 and 3, made August 15 and 16, 1951, that he had a wife named 'Yvonne' living in Chicago whom he had married July 20, 1950. Regarding these assertions as admissions—because they were of an incriminatory nature in view of accused's marriage on March 5, 1951, to Willie Manage—they may not be relied on as proof of the first marriage in the absence of independent corroborative evidence that this marriage had 'probably' been contracted. Manual, supra, paragraph 140a."

406

Finally it is contended that the privilege is personal to the witness-spouse, and consequently the ac- ▪ cused cannot complain of the law officer's refusal to recognize it. This position effectively destroys both the privilege and the policy which led to its establishment. The privilege is different from that of self-incrimination. In the latter instance, the right can still be recognized in any later criminal proceeding against the person whose right was violated. However, no such possibility exists here because the witness-spouse has committed no offense. If the privilege and the policy have any value at all, that value can be realized only by protecting the privilege in the original proceeding. See United States v Mitchell, supra.

I have strong reservations as to whether United States v Long, 2 USCMA 60, 6 CMR 60, and ▪ related cases justify disregard of the allegations of a purported violation of the Arizona statute (see United States v Ekenstam, 7 USCMA 168, 21 CMR 294), but I agree with the result reached by the majority in regard to specification 4. However, I disagree with its conclusion on specification 1.

The question of the notoriety of the accused's relationship with Miss Burns was strongly contested at ▪ the trial. As defense counsel indicated in his closing argument: "The defense does not expect the prosecution to bring everyone in Bisbee to testify as to notoriety. What we want them to do is bring enough people down here to show it was notorious that these people were living together as husband and wife." Instructing the court on the elements of this offense, the law officer, in part, said:

"The court is further advised that the words 'open and notorious cohabitation' mean the act or state of a man and woman not married to each other who dwell together in the same house behaving themselves as man and wife."

Defense counsel objected to the instruction given on the ground that it defined only cohabitation and made no mention of the required notoriety. The accused reiterates the objection on this appeal.

Assuming that, exclusive of references to the Arizona statute, the allegations are sufficient to charge an offense under military law, the law officer's instructions are nevertheless inadequate. As I read the military cases, they make clear that the offense of wrongful cohabitation requires a holding out to others of the relationship of husband and wife—in other words, notoriety. As the board of review in United States v Andrews, 9 CMR 667, 674, said: "It is well established that the conduct of a man and a woman not married to each other, *in openly and publicly dwelling together as husband and wife and holding themselves out as such* is sufficient to constitute the offense of wrongful cohabitation cognizable as a military offense under the General Article." (Emphasis supplied.) Here, the law officer's instructions emphasized the fact of cohabitation. They are completely silent on the requirement of notoriety. They did not, therefore, provide a proper legal standard by which the court-martial could measure the accused's guilt or innocence.

I would set aside the findings of guilty of all specifications of the charge and the sentence and order a rehearing.