UNITED STATES, Appellee

v

LAWRENCE JONES, Airman Third Class, U. S. Air Force, Appellant

14 USCMA 177, 33 CMR 389

No. 16,737

August 2, 1963

*Major William A. Crawford, Jr.,* argued the cause for Appellant, Accused. With him on the brief was *Colonel Daniel E. Henderson, Jr.*

*Major Robert M. Haynes* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Emanuel Lewis.*

KILDAY, Judge:

The accused was tried and convicted by general court-martial for larceny of property and for housebreaking with intent to commit larceny under Articles 121 and 130, Uniform Code of Military Justice, 10 USC §§ 921 and 930, respectively. He was sentenced to a bad-conduct discharge, confinement at hard labor for two months, and reduction to airman basic. Intermediate appellate authorities approved the findings and sentence.

We granted the accused's petition for review to consider whether:

The law officer erred in instructing the court that there was "no such thing as a 'hung jury' in the military" and that they must agree on a sentence.

In light of the issue granted, the facts of the offense are not especially pertinent thereto. Briefly, the evidence reflected that a bar was broken into and used phonograph records valued at over $50.00 were taken. The following day they were found in a room rented by the accused. Testifying for himself, the accused claimed drunkenness and denied any recollection of the event. Instead, he asserted that he could only recall a dream in which he saw himself breaking into the place, taking the records, and returning to his room.

After a finding of guilty of the offenses charged, with unimportant exceptions, presentencing proceedings occurred. After the law officer instructed the court-martial on the maximum sentence and other pertinent matters, court was closed and the members withdrew to deliberate at 9:03 a.m. At 12:24 p.m. the court reopened and after first asking about lunch, with the law officer stating such was permissible, the following is shown by the record:

"PRES: We have one question. On the not being able to agree, is there any time limit set on deliberation? Is it necessary for us to finally come to a decision, or are there cases where, after so long a deliberation, it's a hung jury?

"LO: Sir, there is no such thing as a hung jury in the military. There is no time limit on your deliberations. In that respect, I have an instruction which, in answer to your question, I will repeat when we come back.

"It is your duty as a court to arrive at an appropriate sentence in this case. For this purpose, you should consult together until you can, through reasonable and honest compromise, arrive at a sentence acceptable to the number of members required by Article 52b of the Uniform Code of Military Justice, namely, two-thirds. It is the duty of each member to vote for a proper sentence for the offense or offenses of which the accused has been found guilty, without regard to his opinion or vote as to the guilt or innocence of the accused. Each member must vote for an appropriate sentence, exercising his own judgment and voting according to his conscience. He should, however, give due weight to the opinions of others. If the court becomes sharply divided, each member should examine his own views to determine the justness of his decision in the light of conflicting opinions. You should continue the process of discussion, proposal of sentences, and voting until you have arrived at a sentence.

"Does that answer your question?

"PRES: That is very clear to us.

"LO: With reference to your time limit, gentlemen, the ends of justice are not measured in terms of time, and you should take all the time that you feel is necessary to reach an appropriate and just decision. There is no time limit whatsoever.

"Are there any questions about the instructions which I have given you?

"PRES: No."

The court-martial recessed for lunch, reconvened, and then closed to further deliberate on sentence at 1:35 p.m. It reopened at 3:29 p.m. at which time the aforementioned sentence was pronounced.

Article 52, Uniform Code of Military Justice, 10 USC § 852,[1] sets forth the formula for voting on findings and sentence. With certain exceptions, the votes of two-thirds of the members present is necessary for conviction and sentence. The case at bar is within this provision.

The Manual for Courts-Martial, United States, 1951, paragraph 74d(3), in effect provides that there may be no "hung jury" on the question of guilt or innocence. The cited paragraph restates, in substance, the codal provisions for the necessary concurrence of two-thirds of the members and then provides that "A finding of not guilty results as to any specification or charge if no other valid finding is reached thereon."

As to sentence, however, the Manual merely reiterates the pertinent sections of Article 52, supra, and gives guidelines for procedure. See paragraph 76b(2), (3), Manual for Courts-Martial, United States, 1951.[2] Only

---

[1] "(a) (1) No person may be convicted of an offense for which the death penalty is made mandatory by law, except by the concurrence of all the members of the court-martial present at the time the vote is taken.

"(2) No person may be convicted of any other offense, except by the concurrence of two-thirds of the members present at the time the vote is taken.

"(b) (1) No person may be sentenced to suffer death, except by the concurrence of all the members of the court-martial present at the time the vote is taken and for an offense in this chapter expressly made punishable by death.

"(2) No person may be sentenced to life imprisonment or to confinement for more than ten years, except by the concurrence of three-fourths of the members present at the time the vote is taken.

"(3) All other sentences shall be determined by the concurrence of two-thirds of the members present at the time the vote is taken.

"(c) All other questions to be decided by the members of a general or special court-martial shall be determined by a majority vote. A tie vote on a challenge disqualifies the member challenged. A tie vote on a motion for a finding of not guilty or on a motion relating to the question of the accused's sanity is a determination against the accused. A tie vote on any other question is a determination in favor of the accused."

[2] "(2) *Deliberation and voting.*—The court sits in closed session during deliberation and voting upon the sentence. Only the members of the court will be present. Deliberation may properly include full and free discussion. The influence of superiority in rank shall not be employed in any manner in an attempt to control the independence of members in the exercise of their judgment.

"When the discussion is completed, any member who desires to propose a sentence writes his proposal on a slip of paper. The junior member collects these proposed sentences and submits them to the president. The court then votes on the proposed sentences, beginning with the lightest, until a sentence is adopted by the concurrence of the required number of members. Voting is by secret written ballot. The junior member shall in each case collect and count the votes; the count shall be checked by the president who shall forthwith announce the result of the ballot to the members of the court.

"It is the duty of each member to vote for a proper sentence for the offense or offenses of which the accused has been found guilty, without regard to his opinion or vote as to the guilt or innocence of the accused. Any sentence, even in a case where the punishment is mandatory, must have the concurrence of the required number of members.

"(3) *Number of votes required.*— No person shall be sentenced to suffer death, except by the concurrence of all the members of the court-martial present at the time the vote is taken. No person shall be sentenced to life imprisonment or to confinement in excess of ten years, except by the concurrence of three-fourths of the members present at the time the vote is taken. All other sentences shall be determined by the concurrence of two-thirds of the members present at the time the vote is taken. See Article 52b. If, in computing the number of

in the Appendix is there any indication that thought has been given to the possibility of a court-martial being unable to agree on an appropriate sentence. There, in Appendix 8a, page 521, in a note on voting procedure, the following language appears:

"If all the proposed sentences are voted upon and none adopted, further discussion may be had and either new proposals sought or the sentences already proposed plus any new ones, again put to vote."

An almost identical situation was before an Air Force board of review in United States v Blair, 24 CMR 869. In that case, after two hours and twenty minutes deliberation, the president announced that he did not feel the members could arrive at a sentence with further deliberation at that time. When the law officer suggested that the court be adjourned and that the entire matter be transcribed and referred to the convening authority for further action, there was considerable discussion on both sides as to the propriety of such action, followed by a recess. The court reconvened shortly and the president requested it be closed for further deliberations. After twenty-two minutes the court opened and announced its sentence.

The board of review, in *Blair*, found it "inconceivable that any court of conscientious members . . . should find itself unable to reach agreement on a sentence by the required proportion." 24 CMR at page 873. Adverting to the possibility of an irreconcilable difference, as suggested by Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint,[3] the board stated that, "It could only come about if the court members failed to discharge their duty." 24 CMR at page 873. Apparently, in order to obviate the occurrence of a similar future situation, that board suggested

an instruction to be given which is practically identical with the above-quoted language of the law officer in the case at bar.

Civilian precedents on the exact point in issue are not available for although a Federal jury may be discharged if it is unable to reach a unanimous verdict on guilt or innocence (Rule 31 of the Federal Rules of Criminal Procedure, Title 18, United States Code Annotated. See annotated cases), a decision on sentence is outside its jurisdiction. We can, however, equate the required number of votes in court-martial cases on punishment to the required unanimous verdict in civilian cases on findings. In such an event it becomes quite clear that absent a two-thirds concurrence on sentence, the court-martial, in effect, is "hung"; it just has not been able to agree. To hold that the court members *must* agree or be considered as having "failed to discharge their duty" is repugnant to the basic philosophy on which this country is established—the right of free men to disagree without being penalized therefor. It should be noted here that we are not unmindful of the provisions of Article 106, Uniform Code of Military Justice, 10 USC § 906, which provides the automatic death penalty for wartime spying, and Article 118, Uniform Code of Military Justice, 10 USC § 918, which allows the court-martial to choose only between death or life imprisonment for premeditated murder or felony murder. These are specific statutory penalties and are not a part of instant discussion.

The fact that there were a variety of sentences from which to choose or that the court-martial might even have chosen no punishment at all (Cf. United States v Atkins, 8 USCMA 77, 23 CMR 301; United States v Speller,

votes required, a fraction results, such fraction will be counted as one; thus, if six members are to vote, a requirement that three-fourths concur is not met unless five concur."

[3] "The deliberation of voting need not of course be prolonged where, after repeated votes or comparison of views,

the difference is found to be *irreconcilable*. In such a case the court, in lieu of coming to a formal sentence, can only enter upon the record the fact that they are wholly unable to agree, and thus terminate the proceeding, subject to the action of the reviewing authority." [Page 392.]

8 USCMA 363, 24 CMR 173) does not make it "inconceivable that any court of conscientious members . . . should find itself unable to reach agreement on a sentence by the required proportion." The right to disagree is fundamental regardless of the number of men involved.

Since, in this case, the court members did finally agree, the question is whether they did so conscientiously or whether there is a fair risk that the above-quoted instructions of the law officer left them no alternative. Since we cannot look into their minds, we are limited to a reasonable construction of the law officer's statement.

Initially it should be pointed out that the court-martial had no difficulty in finding the accused guilty for it was in closed session for only twelve minutes when it called the law officer into its session for assistance in putting the findings in proper order. This is in contrast to the total of five hours and sixteen minutes spent in deliberation on sentence, of which approximately one-third was utilized subsequent to the inquiry as to the possibility of a "hung jury."

As we stated in the early case of United States v Richardson, 1 USCMA 558, 4 CMR 150, and have repeated in essence in a number of succeeding cases (see United States v Stringer, 5 USCMA 122, 17 CMR 122; United States v Rinehart, 8 USCMA 402, 24 CMR 212), the law officer acts in a capacity similar to that of a judge in civilian practice. Necessarily, he has the same duty and responsibility to avoid influencing the triers of fact in their decision.

In Boyett v United States, 48 F2d 482 (CA 5th Cir) (1931), the court, in commenting on additional charges given by the trial judge when the jury reported that they were unable to agree, stated that he must exercise caution and refrain from indicating his own opinion as to what verdict should be returned. In addition, it said:

". . . It is also his duty to refrain from any intimidation or coercion of the jury. Kesley v US

(CCA, 5th Circuit) 47 F(2d) 453, decided March 5, 1931; Garst v US (CCA) 180 F 339; Oppenheim v US (CCA) 241 F 625; Lewis v US (CCA) 8 F(2d) 849."

See also United States v Davis, 115 F Supp 392 (Virgin Islands) (1953); 39 Am Jur, New Trial, § 103.

As stated in Reid, Branson's The Law of Instructions to Juries, 3d ed, section 45, page 140:

". . . The court is unauthorized to tell the jury, at any stage of the trial, that they must agree. The statement of a trial judge to a disagreeing jury that they must arrive at a verdict, or language from which such peremptory order is logically inferred, is plain coercion and an invasion by the court of the province of the jury. [Citing numerous State cases.] . . . The trial judge is without legal authority either expressly or impliedly to suggest that the jury compromise in order to arrive at an agreement. A compromise verdict is necessarily the result of the sacrifice by one or more jurors of their conscientious opinions in the case for the sake of agreeing upon a verdict. If the compromise is the result of improper directions or coercion by the trial court, the verdict will be vacated on appeal." [Citing numerous State cases.]

A very thorough and complete discussion of judicial instructions to disagreeing juries is set forth in an annotation to Kesley v United States, supra, in 85 ALR 1418, 1420. Reversible error was found in *Kesley* where the trial judge, upon being informed that the jury was unable to agree, said, " 'Gentlemen, it is apparent to the court that some of you have forgotten that part of the charge of the court as to your oaths as jurors.' " We find this statement very similar to the board of review's position in United States v Blair, supra, that court members have a *duty* to agree.

The popularly referred to "Allen charge," approved by the Supreme Court in Allen v United States, 164

US 492, 41 L ed 528, 17 S Ct 154 (1896), is considered as the outermost limits to which a judge may go in his instructions in an effort to bring a jury to agreement. Green v United States, 309 F2d 852 (CA5th Cir) (1962). The "Allen charge" was taken literally from the charge to the jury in Commonwealth v Tuey, 8 Cush (Mass) 1 (1851). Although not set forth verbatim by the Supreme Court in its opinion, it is quoted in the above-cited annotation to Kesley v United States, supra, at page 1437:

". . . 'But, in conferring together, you ought to pay proper respect to each other's opinions, and listen, with a disposition to be convinced, to each other's arguments. And, on the one hand, if much the larger number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his own mind is a reasonable one, which makes no impression on the minds of so many men, equally honest, equally intelligent with himself, and who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath. And, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably, and ought not to, doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated; and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows.' "

In commenting on these instructions the Supreme Court said:

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the juryroom. The very object of the jury system is to secure unanimity by a comparison of views and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the juryroom with a blind determination that the verdict shall represent his opinion of the case at that moment; or that he should close his ears to the arguments of men who are equally honest and intelligent as himself." [164 US at page 501.]

While the "Allen charge" has been followed and cited with approval in almost all of the circuits (Boston and M.R.R. v Stewart, 254 Fed 14 (CA1st Cir) (1918); United States v Curcio, 279 F2d 681 (CA2d Cir) (1960); Orton v United States, 221 F2d 632 (CA4th Cir) (1955); Andrews v United States, 309 F2d 127 (CA5th Cir) (1962); United States v Barnhill, 305 F2d 164 (CA6th Cir) (1962); Paschen v United States, 70 F2d 491 (CA7th Cir) (1934); Janko v United States, 281 F2d 156 (CA8th Cir) (1960); Jordan v United States, 22 F2d 966 (CA9th Cir) (1927); Johnston v United States, 303 F2d 343 (CA10th Cir) (1962); Egan v United States, 5 F2d 267 (CA DC Cir) (1925)), it is not without its detractors on the ground that even that instruction goes too far toward exerting undue influence on the jury. In Green v United States, supra, the court referred to the "Allen charge" as the "dynamite" charge:

". . . designed to blast loose a deadlocked jury. There is small, if any, justification for its use. Nevertheless, an old decision of the Supreme Court has upheld the charge as a reminder to jurors that 'they should listen, with a disposition to be convinced, to each other's argument.' Allen v United States, 1896, 164 US 492, 17 S Ct 154, 41 L ed 528. This is the outermost limit of its permissible use. There is no justification whatever for its coercive use. The jury system rests in good part on the assumption that the jurors should deliberate patiently and long, if necessary, and arrive at a verdict—if, but only if,

they can do so conscientiously. It is improper for the court to interfere with the jury by pressuring a minority of the jurors to sacrifice their conscientious scruples for the sake of reaching agreement." [309 F2d at page 854.]

In its footnotes to *Green,* the court calls attention to the fact that the "Allen charge" is called the "third degree instruction" in Colorado (Leech v People, 112 Colo 120, 146 P2d 346 (1944)), and the "shotgun instruction" in New Mexico (State v Nelson, 63 NM 428, 321 P2d 202 (1958)), and that its use will no longer be tolerated by the Supreme Court of Arizona (State v Thomas, 86 Ariz 161, 342 P2d 197 (1959)).

The same court in Powell v United States, 297 F2d 318, 321 (CA5th Cir) (1961), said:

"It is implicit in the decisions of the Supreme Court dealing with the Allen case, e.g., Burton v United States, 196 US 283, 25 S Ct 243, 49 L ed 482, and Brasfield v United States, 1926, 272 US 448, 47 S Ct 135, that the Fourth Circuit was correct in its recent holding [citing United States v Rogers, 289 F2d 433 (CA4th Cir) (1961)] 'that the Allen charge, itself, approaches ultimate permissible limits . . .' in handling situations similar to that facing the court below."

The "Allen charge" was upheld as appropriate in Huffman v United States, 297 F2d 754 (CA5th Cir) (1962); however, the dissenting judge, referring to it as "the dynamite charge," stated that "There is no longer any place for the Allen charge . . . [it] is an intrusion by the Judge into the exclusive domain of fact finding by the jury."

Error has been held where the trial court used language from which the jury could reasonably infer that the court intimated the minority should yield their dissenting opinion to the majority. Peterson v United States, 213 Fed 920 (CA9th Cir) (1914); Stewart v United States, 300 Fed 769 (CA8th Cir) (1924); Nigro v United States, 4 F2d 781 (CA8th Cir) (1925); Edwards v United States, 7 F2d 598 (CA8th Cir) (1925); Gideon v United States, 52 F2d 427 (CA8th Cir) (1931). In both *Stewart* and *Nigro* above, excerpts from the Supreme Court opinion in *Allen* were read to the jury, following an inquiry of the foreman as to whether the division among the jurors was large or small. Since the practice of inquiring as to the division of the jury, even though the scope of the question is confined to the proportions of the division without reference to how the jury stands with respect to conviction or acquittal, was criticized by the Supreme Court in Burton v United States, 196 US 283, 49 L ed 482, 25 S Ct 243 (1905), the Eighth Circuit held this inquiry to be error on the ground that it was an extension of the "Allen charge" and, as such, an invasion of the province of the jury.

*Burton* was reversed by the Supreme Court, not, primarily, because of the inquiry as to the division of the jury but because of the refusal of the court to charge the jury that previous defense requested instructions read by the court as "abstract propositions of law" were in fact material to the case at bar. *The jury being unable to agree,* the Supreme Court viewed the situation as one where "the most extreme care and caution were necessary in order that the legal rights of the defendant should be preserved." In such a situation, "A slight thing may have turned the balance against the accused." 196 US at page 307.

In *Peterson,* supra, where the court, upon inquiry, was informed that the jury was split seven to five, the jury was informed that whether the five were for conviction or acquittal, they " 'should . . . seriously inquire whether there is [or is not] a reasonable doubt . . . when seven of their fellows of equal intelligence and honestly find there is [or is no] doubt.' " " 'The government has a right to a verdict without farther expenditure of time and money.' " 213 Fed at page 924. The court, citing the above quotations from *Burton,* stated that, "without cautioning the

jurors against yielding their honest, conscientious convictions, whatever they may have been, to mere numbers or to considerations of economy, . . . Can there be any question that, retiring with the impression that the all-important thing was a final disposition of the case, the jurors consciously or unconsciously bartered the acquittal of one defendant for the conviction of the other?" 213 Fed at pages 925 and 926.

In Shaffman v United States, 289 Fed 370, 375 (CA3d Cir) (1923), the court, citing *Peterson* and *Burton,* said that, "If the charge as a whole, upon a fair and reasonable interpretation, had, or was calculated to have, the effect of coercing the jury into rendering a *compromise verdict,* the judgment must be reversed." (Emphasis supplied.)

Having said all of this, what of the instruction in the case at bar? Does it go beyond the "Allen charge"? Was it coercive in nature? Did it call for a compromise finding? We are inclined to believe that in all instances the answer to our inquiries is yes.

In the first place, the law officer categorically stated that there is no such thing in the military as a "hung jury" on sentence. As noted above, in those cases where the sentence is discretionary with the members of the court-martial, they have the right to conscientiously disagree. To follow this immediately with the statement that there is no time limit on deliberations is to foster the impression that the members *must* agree on a sentence. While this was ameliorated to some extent by the direction that they take the time necessary to reach an appropriate and just decision, they were also instructed that "you should continue the process of discussion, proposal of sentences, and voting until you have arrived at a sentence." When coupled with the admonition

that the members should, "through reasonable and honest compromise, arrive at a sentence acceptable to the number of members required" (emphasis supplied), we must, all things being considered, come to the conclusion that "the charge as a whole, upon a fair and reasonable interpretation, had, or was calculated to have, the effect of coercing the jury into rendering a compromise verdict." Shaffman v United States, supra. Such verdicts cannot stand.

The decision of the board of review is reversed. The case is returned to The Judge Advocate General of the Air Force. A rehearing on sentence may be ordered.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

The majority overlook a fundamental difference between this case and all those mentioned in the principal opinion. In the cited cases, the jury reported it was hopelessly deadlocked, and the instructions were calculated to break the deadlock; hence, the characterization as "dynamite" charges.[1]

Here, the president's question undeniably indicates disagreement among the court members, but it does not suggest an irreconcilable deadlock. Rather, it indicates quite clearly, in my opinion, that the court members wanted to interrupt their deliberations because they were hungry; at the same time they wanted to know whether there was a period of time within which they had to agree or be considered a "hung jury." The material parts of the discussion immediately after the court reconvened in open session are as follows:

"LO: I understand you have a question.

"PRES: Well, first, we were thinking of chow, for one thing.

"LO: Yes, sir.

[1] In addition to my specific disagreement with the majority, I question the validity of certain implications of the principal opinion. For example, I am not at all sure that in a trial for a single offense the failure to attain the required percentage vote for a finding of guilty results in acquittal, rather than a disagreement which justifies another trial.

"PRES: Do we have to eat in the courtroom, or can we adjourn before we eat chow?

"LO: I feel that—the court has been deliberating how long now?

"TC: Three hours.

"LO: Does either counsel have any feelings—Defense counsel?

"DC: Defense counsel has no objection to recessing for lunch.

"LO: Trial counsel?

"TC: Trial counsel has no objection to recessing for lunch.

"LO: Yes. Gentlemen, whether or not you will be allowed to leave here is a matter for my decision, and I see no objection to your leaving—for recessing this closed session in order to go to lunch. However, I must instruct you in this regard. It is absolutely imperative that you abide by these instructions: . . . [At this point he enumerated a number of prohibitions against discussing the case or referring to legal authorities.]

•  •  •  •  •

"PRES: We have one question. On the not being able to agree, is there any time limit set on deliberation? . . .

"LO: . . . In that respect, I have an instruction which, in answer to your question, I will repeat when we come back." [The remainder of the colloquy is set out in the principal opinion and need not be repeated here.]

Nothing contained in the law officer's instructions constitutes a direction or even a suggestion that any court member surrender his conscience or convictions in order to dispose of the case. The instructions say exactly the opposite. The court members were told that each must exercise "his own judgment" and vote "according to his own conscience." They were told to examine their individual views "in the light of conflicting opinions." But they were not told, as the *Allen* decision would have allowed, that they ought to consider the conflicting opinions "with a disposition to be convinced." *Allen v United States*, 164 US 492, 501, 41 L ed 528, 17 S Ct 154 (1896). The instructions were intended, and I am sure they were understood, as no more than an encouragement to reconcile differences. They referred to a possible future division of viewpoint, not to an existing deadlock of unalterable opinion. In short, these instructions bear no resemblance to a dynamite charge. Whatever their fault, they do not demand or request of any court member to yield his own conscience or conviction to the expediency of compromise.

The only error in the instructions is the statement that there can be no irresoluble disagreement, that is, no "hung jury." The real issue in this case, therefore, is whether this comment compelled the court members, to the accused's prejudice, to deliberate on the sentence beyond the time they might otherwise have gone, and to a point they might not otherwise have reached. See *United States v Snook*, 12 USCMA 613, CMR 199. The answer to that question lies, I think, in the president's remarks.

After three hours of deliberation, the president reported merely a desire to have lunch, not a hopeless stalemate amoung the court members. His inquiry about the possibility of a "hung jury" impresses me as a request for information as to whether the court was entitled to deliberate without limitation of time, or whether by law a "hung jury" resulted, if agreement was not reached within a specified period of deliberation. Deliberation for three hours without complaint indicates, in my opinion, a desire to reach an appropriate sentence. The period of deliberation after lunch was one-third shorter than that of the morning session. I am convinced it continued not because of the "hung jury" remark by the law officer, but because the court members themselves desired to reconcile their differences and reach a just sentence. No doubt they believed the sentence they imposed was just, not a forced compromise to save the Government time and money. The offenses of

which the accused was convicted subjected him to a dishonorable discharge and confinement at hard labor for ten years, but the sentence adjudged by the court-martial includes a bad-conduct discharge and confinement for only *two months*. On this record, I see no basis to justify the conclusion that the "hung jury" comment forced the court-martial to continue deliberations on the accused's sentence to his prejudice.

I would affirm the decision of the board of review.