UNITED STATES, Appellee

v

JAMES T. MOORE, Airman Second Class,
U. S. Air Force, Appellant

14 USCMA 635, 34 CMR 415

*Major James E. Caulfield* argued the cause for Appellant, Accused. With him on the brief were *Marvin S. Zelman, Esquire, Thomas P. Meaney, Jr., Esquire,* and *Colonel Daniel E. Henderson, Jr.*

*Major James Taylor, Jr.,* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

QUINN, Chief Judge:

After reviewing the accused's eight-month-old marriage, the Government charged him with four specifications of assault and battery upon his wife. At trial, Mrs. Moore repeatedly refused to testify against her husband, but was directed that she "must answer the trial counsel's questions." Her answers showed the accused struck her on the occasions charged. The accused was convicted and sentenced to a bad-conduct discharge, three months at hard labor, and reduction in grade.

Some of Mrs. Moore's testimony casts considerable doubt on the sufficiency of the evidence. For example, she said the accused slapped her in the face sometime about "the end of February" 1963, but "[n]ot until . . . [she beat] him in the head with a shoe." All of her testimony raises a serious doubt about the wisdom of the prosecution.

The accused was the sole support of Mrs. Moore and her two children by two previous marriages. At the time of trial, Mrs. Moore was pregnant with the accused's child. To provide for the household expenses, the accused worked at two part-time jobs, in addition to his regular military duties. Mrs. Moore wanted the accused to leave the service, apparently to earn more money; he wanted to continue his career. Whatever effect their differences had on their domestic life, they seemingly had no adverse effect upon the accused's military obligations. On a recent efficiency report he was rated an "excellent airman" in his performance as a data processing machine operator. He was also credited with creating "a valuable audit system" and was recommended for more advanced training. His immediate officer in charge, who had known him for approximately eleven months, was of the opinion that he had a "lot of potential," and a greater amount of ability "than a good many other people." The noncommissioned officer in charge of his section reported that his "military appearance, bearing and attitude are of high standard and reflect credit to himself, his duty section and the United States Air Force." According to the accused, he loved his wife "[v]ery much"; he was devoted to the children by her previous marriages, whom he had "every intention of adopting"; and he believed he and his wife could get along well together. Mrs. Moore's testimony suggests she shared his conviction. To burden the accused with a bad-conduct discharge in these circumstances borders on the unconscionable. However, our concern is not with the appropriateness of the sentence or even with the sufficiency of the evidence to support some of the specifications of the charge. The issue is whether, in view of her objection, Mrs. Moore was properly compelled to testify against her husband.

Readers of mystery novels are not the only ones familiar with the saying "a wife can't testify against her husband." The saying has wide currency in the general community; it is, perhaps, one of the legal rules best known to the public. There is good reason for this. The rule is founded upon the vener-

636

able and ancient policy of the state to avoid possible destruction of the marital bond by pitting a wife against a husband, in a trial in which his liberty is at stake. It is based, said the Supreme Court of the United States, upon the "persistent instincts of several centuries"; and the Court rejected a Government plea to abandon the rule as inappropriate in a criminal trial in present-day society. Hawkins v United States, 358 US 74, 79, 3 L ed 2d 125, 79 S Ct 136 (1958). Both tradition and modern practice recognize an exception to the rule. The exception deals with offenses by one spouse against the other. In such cases, the policy of the law is vindicated by recognizing that the victim still has the right to refuse to testify, although the defendant-spouse, by the injury, forfeits the right to prevent the victim-spouse from testifying. In other words, the general rule is that, as to offenses against third persons, one spouse cannot testify against the defendant-spouse over objection; as to offenses against the spouse, the victim-spouse may testify voluntarily, but cannot be compelled to testify over her protest. The rule and the exception were defined by the Supreme Court of the United States as follows:

" . . . Our decision in Hawkins established, for the federal courts, the continued validity of the common-law rule of evidence ordinarily permitting a party to exclude the adverse testimony of his or her spouse. However, as that case expressly acknowledged, the common law has long recognized an exception in the case of certain kinds of offenses committed by the party against his spouse. . . . Exploration of the precise breadth of this exception, a matter of some uncertainty, . . . can await a case where it is necessary. . . .

" . . . Petitioner's attempt to prevent his wife from testifying, by invoking an asserted privilege of his own, was properly rejected [since the offense was committed against her].

. . . . . . .

" . . . To say that a witness-spouse may be prevented from testifying voluntarily simply means that the party has a privilege to exclude the testimony; when, on the other hand, the spouse may not be compelled to testify against her will, it is the witness who is accorded the privilege. . . .

". . . At least some of the bases of the party's privilege are in reason applicable to that of the witness. As Wigmore puts it, op. cit., supra, at p. 264: '[W]hile the defendant-husband is entitled to be protected against condemnation through the wife's testimony, the witness-wife is also entitled to be protected against becoming the instrument of that condemnation,— the sentiment in each case being equal in degree and yet different in quality.' [Wigmore, Evidence, 3d ed, § 2241.] In light of these considerations, we decline to accept the view that the privilege is that of the party alone.

" . . . Neither can we hold that, whenever the privilege is unavailable to the party, it is ipso facto lost to the witness as well. It is a question in each case, or in each category of cases, whether, in light of the reason which has led to a refusal to recognize the party's privilege, the witness should be held compellable. Certainly, we would not be justified in laying down a general rule that both privileges stand or fall together." [Wyatt v United States, 362 US 525, 526–529, 4 L ed 2d 931, 80 S Ct 901 (1960).]

Military law recognizes the rule and the exception. The Manual for Courts-Martial provides as follows:

"Husband and wife are competent witnesses in favor of each other. Although husband and wife are also competent witnesses against each other, the general rule is that both are entitled to a privilege prohibiting the use of one of them as a witness (sworn or unsworn) against the other. This privilege does not exist, however, when the husband or wife is the individual or one of the

individuals injured by the offense with which the other spouse is charged, as in a prosecution for an assault upon one spouse by the other, for bigamy, polygamy, unlawful cohabitation, abandonment of wife or children or failure to support them, for using or transporting the wife for 'white slave' or other immoral purposes, or for forgery by one spouse of the signature of the other to a writing when the writing would, if genuine, apparently operate to the prejudice of such other." [Manual for Courts-Martial, United States, 1951, paragraph 148*e*, at page 277.]

Specification of the conditions under which a particular witness may testify in a judicial proceeding is within the prerogative of the legislature. In the absence of legislative action, the courts are necessarily required to fill the void. As the Supreme Court of the United States observed in Benson v United States, 146 US 325, 336, 36 L ed 991, 13 S Ct 60 (1892), changes in the conditions under which certain witnesses may testify have "been wrought partially by legislation and partially by judicial construction." We need not review the course or the character of these changes in the nearly two centuries of American independence. What is important to this appeal is that the question of the competency of the witness is a rule of evidence. It has been so described by the Supreme Court of the United States and by this Court. Funk v United States, 290 US 371, 381, 78 L ed 369, 54 S Ct 212 (1933); United States v Wise, 10 USCMA 539, 28 CMR 105; see also United States v Wooldridge, 10 USCMA 510, 28 CMR 76, concurring opinion of Judge Ferguson; Alford v Territory of Hawaii, 205 F2d 616 (CA9th Cir) (1953).

Article 36(a) of the Uniform Code of Military Justice, 10 USC § 836, confers upon the President the power to prescribe the "procedure, including modes of proof, in . . . courts-martial . . . which shall, so far as he considers practicable, apply the . . . rules of evidence generally recognized in the trial of criminal cases in the United States district courts."

Since testimony by one
Headnote 4  spouse against another is a rule of evidence, under his grant of authority from Congress, the President can properly define the conditions under which such testimony can be received in evidence at courts-martial.[1] United States v Smith, 13 USCMA 105, 32 CMR 105. The Manual was promulgated in the exercise of the power to prescribe the procedure for military courts. Executive Order 10214, February 8, 1951, 16 FR 1303. It ought, therefore, be approached with the idea that it is regulatory in nature, unless the contrary clearly appears from the text. See United States v Simpson, 10 USCMA 229, 232, 27 CMR 303. The question is whether the text is discoursive rather than prescriptive. Cf. United States v Smith, supra.

Appellate defense counsel contend the Manual provision is merely a discussion of the rule of evidence as it obtains in the regular Federal courts. Applying the rule as it was defined by the Supreme Court of the United States in Wyatt v United States, 362 US 525, 4 L ed 2d 931, 80 S Ct 901 (1960), say counsel, requires the conclusion that the accused's wife was improperly compelled to testify against him.

Some of the language of the Manual provision undeniably imports regulation. The tone and the phrasing of the initial sentence are those ordinarily associated with the statement of a rule or principle. The statement is direct and positive. The next two sentences, however, are of a different order. The form is largely expositive.

---

[1] It has been suggested that notwithstanding a statutory grant of authority to determine rules of evidence, a substantial modification of the right of one spouse to refuse to testify against the other is "uniquely legislative and not judicial" in nature, and, therefore, should be reserved for legislative determination. Dissenting opinion of Mr. Chief Justice Warren, Wyatt v United States, 362 US 525, 535, 4 L ed 2d 931, 80 S Ct 901 (1960).

Instead of stating positively and directly, as does the first sentence, that a husband or wife is also a competent witness against the other, the matter is left to inference, as though it were understood, without being set forth explicitly, that the reader would know such competency was an established principle. The same implied understanding appears as to the exception to this rule. In fact, we have several times held that the latter part of the paragraph is merely "illustrative," *i. e.*, discoursive, and indicative only of the ordinary rule of evidence recognized in the Federal courts. United States v Strand, 6 USCMA 297, 304, 20 CMR 13; United States v Leach, 7 USCMA 388, 22 CMR 178.

A number of the military personnel who participated in the preparation of the Manual apparently believed they assisted in the promulgation of a new rule of evidence. Thus, in the Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, at page 235, it is noted that the privilege "does not exist, and . . . the spouse . . . may be required to testify, if he or she is the victim of the transgression with which the other spouse is charged. See Rex v Lapworth, (1931) 1 KB 117; 28 RCL, Witnesses, section 68." The language of the Manual itself, however, leaves room to doubt the supposition. The doubt is deepened by the reliance of the Legislative Basis upon an English case. Considering the Congressional intention expressed in Article 36(a), that the President follow as nearly as practicable the rules of evidence of the Federal courts, it would indeed be strange that, to follow an English case which Professor Wigmore observes is an exception to the rule giving the witness-spouse the right to refuse to testify, the President would disregard an established line of Federal precedents and a Congressional enactment for the District of Columbia which specifically directs that one spouse may not be compelled to testify against the other. See United States v Leach, supra, at page 405, and Wyatt v United States, supra, 362 US 525, at page 529. Another point of

doubt is the apparent absence of any substantial reason indicating it is more desirable or more practicable for the military to disregard the ordinary rule of evidence and compel one spouse to testify against the other. See United States v Smith, supra, at page 120.

Looking at the equivocal language of the Manual provision; the illustrative nature of its definition of offenses outside the scope of the privilege; and the uncertain need for, or desirability of, a substantially different rule of evidence for the military courts, we are persuaded that the Manual does not create a rule of law. It merely comments on the rule prevailing in the Federal courts. The rule was most recently defined in the *Wyatt* case, supra. A few state courts construing their respective statutes have held in favor of compellability. See Bramlette v State, 21 Tex App 611, 2 SW 765 (1886); State v Lynch, 2 W. W. Harrington (Del) 600, 128 Atl 565 (1925); cf. Title 14, District of Columbia Code, 1961 edition, § 14-306. But so far as it is consistent with the Uniform Code of Military Justice, and the special rules prescribed by the President, the practice in military courts corresponds to that in the regular Federal courts. United States v Smith, supra; United States v Jones, 14 USCMA 177, 33 CMR 389.

In the *Wyatt* case, supra, 362 US 525, at page 530, the Supreme Court of the United States determined that a wife who had been transported by her husband in interstate commerce for the purpose of prostitution, in violation of the Mann Act, could be compelled to testify against him. A majority of the Court reached this conclusion because of the special "legislative judgment underlying" the Mann Act. No similar Congressional judgment or policy is embodied in a prosecution for assault and battery, under Article 128 of the Uniform Code, supra, 10 USC § 928. We hold, therefore, that the accused's wife was improperly compelled to testify against him.

Left for determination is whether the accused has standing to seek reversal of his conviction because of the erroneous denial of the wife's privilege to refuse to testify. Professor Wigmore argues that, where one spouse is erroneously compelled to testify against the other, the "only interest injured is that of the privileged person" and the defendant-spouse ought not to be allowed to urge the error as ground for reversal of a conviction. He concedes, however, that some courts allow the defendant the right to except to the ruling. Wigmore, Evidence, § 2196(2)(a) (McNaughton rev. 1961). In a dictum in Shores v United States, 174 F2d 838 (1949), which was also a Mann Act prosecution, the Court of Appeals for the Eighth Circuit indicated that the defendant had no standing to object to an erroneous denial of the right of his wife to refuse to testify against him. However, in the *Wyatt* case, supra, the Government did not question the right of the defendant-spouse to raise the issue. As a result, the Supreme Court of the United States did not "intimate . . . [any] view" on the point. Wyatt v United States, supra, 362 US 525, at page 527, footnote 3. Government counsel here contend that in military courts the matter was decided against the accused in United States v Leach, 7 USCMA 388, 22 CMR 178, and United States v Riska, 33 CMR 939, petition denied, 14 USCMA ———, 33 CMR 436. Neither case concludes the issue.

In *Riska,* supra, the accused was convicted of larceny of a television belonging to a fellow airman and of an assault upon his wife. At trial, the accused's wife was compelled to testify against him. The board of review sustained the ruling. The accused petitioned this Court for further review. The record of trial showed the accused's own testimony amounted to a judicial confession of guilt of the assault charge. There was, therefore, no good cause for further review,

and we denied the petition. See United States v Tharp, 11 USCMA 467, 469, 29 CMR 283.

In the *Leach* case, supra, each Judge took occasion to state separately some of his views on the right of the defendant-spouse to allege, as ground for reversal of a conviction, an erroneous denial of the privilege of the witness-spouse to refuse to testify against him. But there was no definite holding on the point by a majority of the Court. The majority of the Court agreed that, assuming error in the ruling denying the wife the privilege to refuse to testify, there was no prejudice because her testimony "was at best cumulative . . . and did not . . . contribute in any substantial way to the finding of guilt." United States v Leach, supra, at pages 400–401, 404. In the course of his discussion of the privilege of the wife to refuse to testify, the author of the principal opinion indicated agreement with the view that a defendant-spouse has no standing to complain. But he did not rule on the issue. He stated merely that he had "determined to answer the contention without regard to accused's right to complain." *Id.,* at page 397.[2] The concurring Judge joined in the conclusion the accused was not prejudiced by the wife's testimony. In passing, he indicated it "appears to be the better rule that in such instances [offenses against the witness-spouse] a defendant has no standing to complain." *Id.,* at page 404. So far as it dealt with the issue of compellability, *Leach,* supra, left the matter open to future decision.

Professor Wigmore has frequently been cited as authority for the view that the defendant-spouse has no standing to object to an erroneous denial of the witness-spouse's privilege. We agree with his argument that a criminal trial is not a game in which every erroneous evidentiary ruling is ground for reversal. See United States v Wilson, 7 USCMA 713, 23 CMR 177. Sometimes, however, the

---

[2] In a later case, the author Judge reiterated his views, but again the discussion was dictum. United States v Wooldridge, 10 USCMA 510, 517, 28 CMR 76.

public policy behind a rule of evidence can be effectuated only by enforcing the rule. This is true, for example, of the rule against unreasonable search and seizure. On those occasions, the Wigmore argument suffers from inflexibility.

Paralleling his position denying the right of the defendant to challenge a ruling compelling his wife to testify against him, Wigmore argues that a defendant should not be permitted to attack the illegality of the means by which relevant evidence is obtained. Wigmore, op cit, § 2183. This attitude contemplates that the only remedy for violation of a Constitutional privilege is to punish the offender in a separate civil or criminal proceeding. *Id.*, § 2184a; see also Flagg v United States, 233 Fed 481 (CA 2d Cir) (1916), concurring opinion of Judge Veeder. Such impractical and ineffectual means of safeguarding a Constitutional policy were rejected by the Supreme Court of the United States. In Weeks v United States, 232 US 383, 393, 58 L ed 652, 34 S Ct 341 (1914), the Supreme Court held that the prohibition against unreasonable search and seizure "might as well be stricken from the Constitution" if illegality of the seizure of the evidence could not be raised by the defendant in the immediate proceedings against him. The necessity of enforcing a policy, without regard to the truthfulness and the relevance of the evidence, is also present in other situations. Mr. Justice Frankfurter has pointed out that as to the defense of entrapment, the courts "refuse to convict an entrapped defendant, not because his conduct falls outside the proscription of the statute, but because, even if his guilt be admitted, the methods employed on behalf of the Government to bring about conviction cannot be countenanced." Sherman v United States, 356 US 369, 380, 2 L ed 2d 848, 78 S Ct 819 (1958); see also United States v Haynes, 9 USCMA 792, 27 CMR 60. What is at stake in instances of this kind is whether the court should set its face against an established rule of evidence, and consummate a wrong which cannot otherwise be effectively righted.

We, and other courts, have held that the erroneous denial of the right of a witness to refuse to testify to matters which might incriminate him is not ground for reversal of an otherwise valid conviction of the accused. United States v Murphy, 7 USCMA 32, 21 CMR 158; Hudson v United States, 197 F2d 845 (CA 5th Cir) (1952). In that situation, an erroneous ruling denying the privilege against self-incrimination to the witness does not conclude the matter. The policy behind the rule can be completely vindicated in any criminal proceeding that may subsequently be brought against the witness. Can the same thing be said of the policy at the base of the right of one spouse to refuse to testify against the other? We think not.

One of the reasons for the continued vitality of the rule of testimonial privilege by a spouse is that public policy favors the maintenance of the family relationship. The policy is designed not merely to foster private relationships between husband and wife, but also to advance the public interest. The Supreme Court of the United States, in Hawkins v United States, articulated the policy as follows:

". . . The basic reason the law has refused to pit wife against husband or husband against wife in a trial where life or liberty is at stake was a belief that such a policy was necessary to foster family peace, not only for the benefit of husband, wife and children, but for the benefit of the public as well. Such a belief has never been unreasonable and is not now. Moreover, it is difficult to see how family harmony is less disturbed by a wife's voluntary testimony against her husband than by her compelled testimony. In truth, it seems probable that much more bitterness would be engendered by voluntary testimony than by that which is compelled. But the Government argues that the fact a husband or wife testifies

**641**

against the other voluntarily is strong indication that the marriage is already gone. Doubtless this is often true. But not all marital flare-ups in which one spouse wants to hurt the other are permanent. The widespread success achieved by courts throughout the country in conciliating family differences is a real indication that some apparently broken homes can be saved provided no unforgivable act is done by either party. Adverse testimony given in criminal proceedings would, we think, be likely to destroy almost any marriage." [Hawkins v United States, 358 US 74, 77–78, 3 L ed 2d 125, 79 S Ct 136 (1958).]

Occasional or sporadic injury to one spouse by the act of the other does not mean that the marriage is necessarily a failure or so unstable that enforcement of the public policy for its preservation is no longer justified. An old bachelor once observed that marriage is a license to fight. Certainly, not all husbands and wives are paragons of patience, restraint, and understanding; if they were, the rates of divorce and separation would not be as high as they are. But love, especially in the marital relationship, contemplates a turn of the other cheek. Matthew 5:39. The will and the desire to continue the marriage, despite the infliction of some injury by one spouse upon the other, are not only for those who believe in the sacramental nature of matrimony. European psychologist, Ignace Lepp, has pointed out that marriage possesses a strong "sociological value." "The Psychology of Loving," at pages 159–160.

From the standpoint of the wife and society, it is certainly much more desirable, especially if there are children, that she remain in a united household with her husband, in spite of any passing injury to her, if the husband otherwise fulfills his marital responsibilities and obligations. Yet, if by reason of an erroneous denial of the privilege to refuse to testify, one becomes the instrument of the other's punishment, are not the chances for preservation of the spir-

itual and societal values materially diminished? If the erroneous ruling is permitted to stand because the accused is not allowed to object to it, there is no feasible way to avoid its harmful effects. Unlike the case of the witness who is forced to incriminate himself by an erroneous denial of his privilege, there is no other forum in which the error can be corrected, and the victim of the error be protected against its consequences. Perhaps a husband condemned to prison or disgrace by the testimony of his wife may be able to rationalize between voluntary testimony and compelled testimony, but we do not believe that the public policy behind the rule justifies the risk. In jurisdictions in which, by statute, one spouse is granted the privilege to refuse to testify against the other, the courts have recognized the defendant-spouse's right to urge the denial of the privilege as error. See State v Dunbar, 360 Mo 788, 230 SW 2d 845 (1950); State v Le Fils, 209 Ore 666, 307 P2d 1048, 1049 (1957). We hold, therefore, that the error in compelling the wife to testify against her will may be noticed and corrected on appeal. The compelled testimony of the wife was the only material evidence against the husband. Consequently, the findings of guilty and the sentence are set aside. United States v Parker, 13 USCMA 579, 33 CMR 111.

The decision of the board of review is reversed. The findings of guilty and the sentence are disapproved. A rehearing may be ordered.

Judge Ferguson concurs.

Kilday, Judge (concurring):

In my view it is important to note, as my associates point out, that the question before us involves a rule of evidence, and has been consistently treated as such by both the Supreme Court and this Court. Thus, I agree wholeheartedly with my brothers that it is clearly a matter within the authority of the President, who is empowered to prescribe "The procedure, including modes of proof, in cases be-

fore courts-martial." Article 36, Uniform Code of Military Justice, 10 USC § 836; United States v Smith, 13 USCMA 105, 32 CMR 105.

As the Court's opinion also recognizes, the President has, in the exercise of this power, promulgated paragraph 148e, Manual for Courts-Martial, United States, 1951, which states the applicable rule and exception. If the question were an open one, I would be inclined to view the whole of the pertinent provision of the Manual, quoted by my colleagues, as prescriptive and regulatory, rather than discoursive or expositive. I would prefer the approach that the language is clear and unambiguous and thus should be applied, not interpreted. See United States v Davis, 12 USCMA 576, 31 CMR 162.

However, the question of the husband-wife relationship and privilege is not a matter of first impression here. The same has been before the Court on previous occasions. See United States v Strand, 6 USCMA 297, 20 CMR 13; United States v Leach, 7 USCMA 388, 22 CMR 178; United States v Wooldridge, 10 USCMA 510, 28 CMR 76; United States v Wise, 10 USCMA 539, 28 CMR 105. See also United States v Parker, 13 USCMA 579, 33 CMR 111. The approach taken by my brothers in those cases, and set forth in this opinion, is controlling. In view of the fact that the matter has been determined by my associates; because of the importance of the question and the necessity that those in the field and at other appellate levels have a firmly settled rule to apply; and with due regard for the principle of *stare decisis*, I join in reversing the decision of the board of review.

Accordingly, I concur.